NURSE MIDWIFERY ASSOCIATES; Susan Sizemore; Victoria Henderson; Darrell Martin, M.D.; Richard and Margaret Carpenter, Plaintiffs–Appellants (88–5842), Plaintiffs–Appellees (88–5491),

v.

B.K. HIBBETT, M.D.; E. Conrad Shackleford, M.D.; George Andrews, M.D.; Stephen Melkin, M.D.; Harry Baer, M.D.; State Volunteer Mutual Insurance Company, Inc., and Vanderbilt University Hospital, Defendants–Appellees (88–5842),

Southern Hills Hospital; and Hendersonville Community Hospital, Defendants–Appellants (88–5491).

Nos. 88–5842, 89–5491.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 29, 1989.

Decided Nov. 6, 1990.

Rehearing and Rehearing En Banc Denied Jan. 10, 1991.

ment.

Larry D. Woods, Irwin B. Venick (argued), Woods & Woods, Robert J. Walker, Bass, Berry & Sims, W. Warner McNeilly, Jr., Watkins, McGugin, McNeilly & Rowan, Joseph G. Cummings, Boult, Cummings, Conners & Berry, W. Harold Bigham, Gullet, Sanford, Robinson & Martin, Nashville, Tenn., Jack R. Bierig (argued), Sidley & Austin, Chicago, Ill., Kevin D. McDonald, Jones, Day, Reavis & Pogue, Washington, D.C., Mary Frances Lyle, Bruce, Weathers, Dughman & Lyle, Ward DeWitt, Trabue, Sturdivant & DeWitt, Nashville, Tenn., for plaintiffs-appellants and plaintiffs-appellees.

Ward DeWitt, Andree K. Blumstein (argued), Trabue, Sturdivant & DeWitt, Robert S. Patterson, Boult, Cummings, Conners & Berry, W. Warner McNeilly, Jr., John B. Carlson (argued), Watkins, McGugin, McNeilly & Rowan, Nashville, Tenn., Richard D. Roskin, Chicago, Ill., Barbara J. Moss, W. Harold Bigham, Gullet, Sanford, Robinson & Martin, Nashville, Tenn., Jack R. Bierig (argued), William H. Baumgartner, Jr., Sidley & Austin, Chicago, Ill., Robert J. Walker, R. Dale Grimes, Bass, Berry & Sims, Julia C. Morris, Nashville, Tenn., for defendants-appellees.

Ames Davis (argued), Robert E. Boston, Waller, Lansden, Dortch & Davis, Nashville, Tenn., Kevin D. McDonald, Jones, Day, Reavis & Pogue, Washington, D.C., Charles L. Kown, Nashville, Tenn., for defendants-appellants.

Before MARTIN and NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.

ALAN E. NORRIS, Circuit Judge.

This case involves two appeals arising out of an antitrust action brought by two nurse midwives, the obstetrician with whom they had affiliated, and three of their clients, against three Nashville hospitals, certain members of the medical staffs from two of the hospitals, another practicing obstetrician in Nashville, and a physician-controlled insurance company. Plaintiffs alleged that these defendants had engaged in several conspiracies to restrain trade, in violation of section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1. Plaintiffs now appeal the district court's decision awarding summary judgment to defendants with respect to all but one of the alleged conspiracies. 689 F.Supp. 799. Two of the hospitals also bring an interlocutory appeal, contending that the district court erred in denying summary judgment with respect to the alleged conspiracy between the two hospitals. For the reasons stated, we affirm in part and reverse in part.

I.

In an earlier opinion, in which it ruled upon a motion to dismiss, the district court well-summarized the gravamen of plaintiffs' cause of action.

The crux of the complaint is that the defendant physicians, in order to protect their lucrative obstetrics practices in Nashville, Tennessee, sought to prevent the nurse midwives from competing with

them. The defendant physicians allegedly entered into a conspiracy for the purpose of preventing plaintiffs from operating a family-centered maternity practice or offering nurse midwifery services at hospitals in the Nashville area. In furtherance of that objective the defendant physicians determined to bar plaintiff nurse midwives from obtaining hospital privileges at defendant hospitals and the supervision of a licensed physician.

The complaint alleges that in order to offer the type of maternity practice plaintiffs contemplated, a qualified obstetrician must be responsible for the medical care provided by nurse midwives. To prevent plaintiff nurse midwives' competition, therefore, defendant physicians conspired to bring pressure to bear upon Dr. Martin and any other physician who anticipated collaborative practice with the nurse midwives.

*Nurse Midwifery Assocs. v. Hibbett*, 549 F.Supp. 1185, 1187 (M.D.Tenn.1982).

In his report and recommendation on defendants' motion for summary judgment, the magistrate included a thirty-page synopsis of the summary judgment evidence. As the parties did not object to this summary, we will rely upon it for our recitation of the factual background of this appeal.

Plaintiffs Susan Sizemore and Victoria Henderson are certified nurse midwives who formed Nurse Midwifery Associates ("NMA") in order to provide nurse midwifery service in the private sector of the Nashville, Tennessee area. NMA entered into an agreement with plaintiff Dr. Darrell Martin, a practicing obstetrician, under which NMA would operate as an independent practice, and Dr. Martin and his associates would provide medical supervision and services.

A. Hendersonville Community Hospital and Dr. Shackleford

Hendersonville Community Hospital ("HCH") is a privately owned community hospital located in Hendersonville, Tennessee, a small town in the Nashville area.

Dr. Martin and his associates were members of the active medical staff of HCH. On February 18, 1980, after initial positive discussions with the administrator of HCH, plaintiffs Henderson and Sizemore submitted their applications for appointment to the medical staff, and for clinical privileges to practice nurse midwifery in collaboration with physicians.

The next day, the hospital's administrator advised Henderson and Sizemore that their applications had been approved by the HCH Obstetrics Department, pending approval of their protocol.[1] On March 8, 1980, the Obstetrics Department approved the protocol.

In late March, the Pediatrics Department, including Dr. Conrad Shackleford, met and discussed the nurse midwifery proposal. The department unanimously recommended that the proposal be rejected, raising six concerns. During April and May, the Obstetrics and Pediatrics Departments held several meetings and, although it appeared that the concerns of the pediatricians had been satisfactorily answered, they refused to approve the protocol.

At a meeting of the Medical–Executive Committee on April 23, 1980, Dr. Shackleford, a member of the committee, said that a number of pediatricians would leave the staff of HCH if they were required to treat newborns delivered by nurse midwives.

At a subsequent meeting, the members of the Pediatrics Department confirmed that they would not treat newborns delivered by nurse midwives under the on-call schedule normally used for newborns delivered by obstetricians. They agreed that a pediatrician with active privileges at HCH should be recruited by nurse midwives to serve as back-up. Dr. Shackleford joined in these agreements.

On May 20, 1980, the Executive Committee, including Dr. Shackleford, voted to accept the final action of the Pediatrics Department. As a result of these actions, Henderson and Sizemore were unable to initiate their practice at HCH.

---

**1.** The protocol is the document setting out the details of the supervisory relationship between nurse midwives and the supervising obstetrician.

**B. Southern Hills Hospital and Drs. Melkin, Andrews and Baer**

Southern Hills Hospital ("SHH") is a small, privately owned community hospital in Nashville. Before HCH took final action on their applications, Sizemore and Henderson applied for appointments to the medical staff at SHH. Sizemore and Dr. Martin met initially with the administrator of SHH who told them that SHH by laws would permit the granting of privileges to nurse midwives. The administrator was encouraging regarding their proposal, but stated that he did what the doctors at SHH wanted him to do.

On June 18, 1980, the Executive Committee of SHH began its initial review of the applications and appointed an ad hoc committee to investigate the proposal. The committee was composed of defendant Dr. George Andrews, Chairman of SHH's Obstetrics Department, three other doctors, and an attorney.

In July 1980, Dr. Martin met with Dr. Stephen Melkin, a specialist in OB/GYN at SHH and a member of the Executive Committee. Dr. Melkin displayed an extremely negative reaction toward NMA, stating, "If nurse midwives started delivering babies, the next thing they would want to do is heart surgery."

In that same month, Dr. Harry Baer, an obstetrician who was a member of the SHH medical staff, told an obstetrician at Baptist Hospital that plaintiffs would get privileges at Baptist "over his dead body." Dr. Baer practiced medicine in partnership with Dr. Melkin; both practice at Baptist Hospital as well as SHH. Also, Dr. Baer expressed concern that other obstetricians just starting out were not yet "up to capacity."

On August 7, 1980, plaintiffs were given an opportunity to discuss their protocol with the ad hoc committee. The committee, most notably Dr. George Andrews, appeared not to be interested in the manner in which nurse midwives practiced or the specific practice arrangement between plaintiffs, but seemed overly concerned with the financial relationship between nurse midwives and Dr. Martin.

At the SHH Executive Committee meeting on September 25, 1980, the ad hoc committee's report was adopted, recommending that the nurse midwives' applications be denied in their present form. The report also recommended that privileges be granted if additional conditions were met. The principal conditions were that an obstetrician be present for all deliveries, that two obstetricians with privileges at SHH agree to sponsor, supervise, and assume responsibility for the nurse midwives' actions, and that the sponsoring physicians furnish adequate liability insurance indemnifying SHH for the activities of nurse midwives. The report concluded that these conditions were "necessary to assure quality patient care and reduce any risk of injury to a patient with possible ensuing liability to the Hospital."

On October 16, 1980, the SHH Board of Trustees adopted the recommendation of the Executive Committee and denied the nurse midwives' application for privileges. When the administrator informed the petitioners that their applications had been denied, they asked for a copy of the ad hoc committee's report, but were refused. Dr. Andrews told them that if they were to reapply, the Obstetrics Department would adopt new policies regarding mandatory enemas, perineal shaving, electronic fetal monitoring, intravenous fluids and ambulation, and would close the birthing room.

**C. Vanderbilt University Hospital and Dr. Hibbett**

Vanderbilt University provides medical education through the Vanderbilt University Medical Center, which includes the university's School of Medicine and University Hospital ("Vanderbilt"). Through 1980, Vanderbilt required that persons seeking practice privileges at its hospital hold an appointment to the faculty of the School of Medicine.

In May 1980, Henderson and Sizemore applied for appointments to the Vanderbilt Allied Medical staff. The Chairman of the Department of Obstetrics and Gynecology, Dr. Lonnie S. Burnett, was vested with sole

authority for recommending faculty appointments to the Dean and for selecting and implementing any new programs for the department. Dr. Burnett construed the nurse midwives' application as seeking faculty appointments and as a request for the establishment of a nurse midwifery training program at the hospital.

While the application was pending, both Dr. Burnett and Dr. Frank Boehm, a member of the Vanderbilt OB/GYN Department, held conversations with Dr. B.K. Hibbett, a local obstetrician with privileges at Vanderbilt. Dr. Hibbett had recently been Chief of the OB/GYN Department at Baptist Hospital, remained an influential member of its staff, and had been an outspoken opponent of nurse midwifery. All three doctors deny that they discussed the subject of nurse midwifery or the nurse midwives' applications.

Vanderbilt had reason to maintain good relationships with Baptist Hospital. As hospitals with the two largest maternity services in Nashville, there was considerable overlap among their OB/GYN staffs. In addition, Baptist Hospital allowed Vanderbilt's OB/GYN residents to rotate through Baptist as part of their residency training.

On September 2, 1980, Dr. Burnett announced Vanderbilt's decision denying the nurse midwives' applications. Two reasons were given for this decision: (1) Allied Medical Staff members had historically been employees of the institution, and (2) Vanderbilt's commitment to tertiary care made it inappropriate for the hospital to grant privileges to plaintiffs, who would primarily be doing normal obstetrics.

## D. State Volunteer Mutual Insurance Company and Dr. Hibbett

State Volunteer Mutual Insurance Company ("SVMIC") is a nonprofit mutual insurance company, owned and operated by its physician policyholders. The policyholders elect the Board of Directors and participate on SVMIC's committees. SVMIC insures almost eighty percent of all physicians in Tennessee, and is organized under the auspices of the Tennessee Medical Association ("TMA"). Plaintiffs allege that the TMA has long been opposed to the expanded use of nurse midwives.

SVMIC learned in June of 1980 that Dr. Martin would be leaving his practice group and would be associated with NMA. SVMIC's underwriter wrote to Dr. Martin seeking clarification of his relationship with NMA and asking for "any other pertinent information which will help us to determine our exposure as your malpractice carrier."

On July 31, 1980, Dr. Hibbett, a member of the SVMIC Board of Directors and a member of the SVMIC Claims Review Committee, had a conversation with an obstetrical nurse at Baptist Hospital concerning SVMIC's upcoming meeting to consider whether to continue to insure Dr. Martin in light of his affiliation with NMA. During the conversation, Dr. Hibbett told the nurse something to the effect of "we're going to get Dr. Martin's insurance," and that "we would set nurse midwifery back twenty years." An obstetrician who practiced at Baptist Hospital also recalls a similar conversation with Dr. Hibbett.

The Underwriting Committee of SVMIC concluded that Dr. Martin's relationship with nurse midwives increased the underwriting risks to SVMIC to an unacceptable level, and adopted a motion to cancel his insurance. It also named an ad hoc subcommittee, composed of two Nashville physicians, SVMIC's outside counsel and staff to determine whether its assessment of the risks posed by coverage of Dr. Martin was justified. The committee concluded that the underwriting risks posed by Dr. Martin were in fact unacceptable.

On October 29, 1980, the recommendation of the Underwriting Committee to cancel Dr. Martin's coverage came before the Board of Directors. There was no discussion concerning competition from the midwives or any other competitive considerations. However, the board only reviewed the Consulting Agreement between NMA and Dr. Martin; it did not review the medical protocol which described in detail the medical supervision Dr. Martin would exercise over NMA's practice. The board, in-

cluding Dr. Hibbett, voted unanimously not to renew Dr. Martin's coverage.

Dr. Martin requested a hearing before the Underwriting Committee and, at the meeting, presented information concerning his arrangement with NMA. The committee determined that it had made the correct decision in recommending that the insurance be terminated, and advised Dr. Martin of his right to appeal the decision to the Board of Directors. He did not appeal.

Henderson and Sizemore were unable to secure the services of another supervising physician and discontinued their nurse midwifery practice.

## II.

On March 2, 1981, plaintiffs filed their complaint raising claims under the Sherman Antitrust Act and various pendent state law claims. Named in the suit was HCH and Dr. Shackleford; SHH and Drs. Melkin, Baer, and Andrews; Vanderbilt; SVMIC; and Dr. Hibbett. The complaint alleged that competition was restrained due to conspiracies (1) among HCH, Dr. Shackleford, and the other members of the HCH pediatric staff, (2) among SHH and Drs. Melkin, Baer, and Andrews; (3) between Vanderbilt and the members of its medical staff, (4) between Vanderbilt and Dr. Hibbett, (5) between HCH and SHH, and (6) between SVMIC and Dr. Hibbett. In addition, plaintiffs contended that the actions of SVMIC constituted the actions of a group of competitors, rather than those of a single company.

Defendants all moved for summary judgment and the motions were referred to a magistrate, who recommended that summary judgment be granted against plaintiffs on all of the federal claims against SVMIC, Drs. Shackleford, Melkin, Baer, and Andrews, and that partial summary judgment be granted in favor of HCH, SHH, Vanderbilt, and Dr. Hibbett. He recommended that summary judgment be denied on plaintiffs' claim of conspiracy between SHH and HCH and their claim of

conspiracy between Vanderbilt and Dr. Hibbett. Plaintiffs and defendants SHH, HCH, Vanderbilt, and Dr. Hibbett filed objections to the report and recommendation.

The district court rejected the recommendation that summary judgment be denied with respect to plaintiffs' claim of conspiracy between Vanderbilt and Dr. Hibbett, but adopted the recommendations that summary judgment be granted on all of plaintiffs' claims except their claim of a conspiracy between SHH and HCH. Pursuant to Fed.R.Civ.P. 54(b), the district court determined that there was no just reason for delay and entered final judgment on all of plaintiffs' claims except for the claim of conspiracy between SHH and HCH. Plaintiffs appealed all of these judgments but have since reached a settlement with Vanderbilt.

In addition, the district court entered an order allowing defendants SHH and HCH to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on its decision denying summary judgment on plaintiffs' claims of a conspiracy between these two defendants. This court granted permission for the interlocutory appeal and consolidated it with plaintiffs' appeal.

## III.

**A. The Conspiracies Among the Hospitals and Their Medical Staffs**

■ To establish a violation of section 1 of the Sherman Act, 15 U.S.C. § 1,[2] a plaintiff "must establish that the defendants combined or conspired with an intent to unreasonably restrain trade." *Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 949 (6th Cir.1983). It is crucial that a plaintiff demonstrate that there has been a contract, combination, or conspiracy between separate entities, because section 1 does not reach unilateral conduct even if such conduct unreasonably restrains trade. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Unilateral

---

**2.** "Every contract, combination ... or conspiracy, in restraint of trade or commerce ... is illegal." 15 U.S.C. § 1.

conduct is governed by section 2 of the Sherman Act, 15 U.S.C. § 2, "and is unlawful only when it threatens actual monopolization." *Id.* Under section 1, only after the court has found that there was a conspiracy will it examine whether the conduct was unreasonable.

Congress treated concerted behavior more strictly than unilateral behavior because it

> inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

*Id.* at 768–69, 104 S.Ct. at 2740.

■ Not every agreement or coordinated conduct between two or more entities constitutes a conspiracy under section 1. For example, under the intra-enterprise rule, a parent corporation and its wholly owned subsidiary are viewed as a single enterprise for purposes of section 1 of the Sherman Act, because

> [t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Id.* at 771, 104 S.Ct. at 2741–42. Similarly, an agreement between officers or employees of the same firm does not ordinarily constitute a section 1 conspiracy, because officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively....

*Id.* at 769, 104 S.Ct. at 2740–41. For the same reasons, a corporation cannot ordinarily conspire with its agents or employees. *See, e.g., Smith v. Northern Mich. Hosps.*, 703 F.2d 942, 950 (6th Cir.1983). These rules have been collectively referred to as the "intracorporate conspiracy doctrine." *See, e.g.,* Handler & Smart, *The Present Status of the Intracorporate Conspiracy Doctrine,* 3 Cardozo L.Rev. 23 (1981), *cited in Copperweld,* 467 U.S. at 766 n. 12, 104 S.Ct. at 273 n. 12.

Some courts have held that the intracorporate conspiracy doctrine does not prevent a finding of a conspiracy between a hospital and its medical staff or among the members of the medical staff, because the relationships between a medical staff and a hospital or among a medical staff are different than the relationships between a corporation and its agents or among those agents. *See, e.g., Bolt v. Halifax Hosp. Medical Center,* 851 F.2d 1273, 1280 (11th Cir.), *vacated,* 861 F.2d 1233 (11th Cir.1988) (en banc), *reinstated in part,* 874 F.2d 755 (11th Cir.1989) (en banc); *Weiss v. York Hosp.,* 745 F.2d 786, 813–17 (3d Cir.1984). These courts determined that a hospital's medical staff are more than "agents" of the hospital for antitrust purposes.

The Eleventh Circuit, in *Bolt,* held that members of a medical staff must be considered to be more than just officers of a corporation and are capable of conspiring both among themselves and with the hospital. 851 F.2d at 1280. The court reasoned that members of a medical staff are capable of conspiring among themselves because each member of the medical staff, unlike an officer of a corporation, "is a separate economic entity potentially in com-

petition with other physicians." *Id.* Furthermore, the court reasoned that the medical staff and the hospital are capable of conspiring together since "[a] hospital and the members of the medical staff, in contrast to a corporation and its agents, are legally separate entities, and consequently there is no similar danger that what is in fact unilateral activity will be bootstrapped into a 'conspiracy.'" *Id.; see also Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450 (9th Cir.1988) (adopting the reasoning of *Bolt*).

The Third Circuit, in *Weiss*, issued a more narrow holding. As in *Bolt*, the court held that the individual members of the medical staff were capable of conspiring among themselves because they were not merely officers of the hospital but were practicing medicine in their individual capacities in competition with each other. 745 F.2d at 814–17. However, the court also held that the members of the medical staff were acting only as officers of the hospital when they made staff privilege decisions for the hospital and could not conspire with the hospital, because the medical staff was not in competition with the hospital. *Id.* at 816–17.

In addition, other courts have recognized an exception to the rule that a corporation cannot conspire with its agents or employees, and have held that such a conspiracy can exist when the employee has an independent personal stake in achieving the object of the conspiracy. *See, e.g., H & B Equip. Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978); *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399–400 (4th Cir. 1974). However, on two occasions this court, while not specifically rejecting the independent personal stake exception, has noted that "[t]here are rather substantial policy reasons for not adopting such an exception." *Potters Medical Center v.*

*City Hosp. Ass'n*, 800 F.2d 568, 573 (6th Cir.1986); *Smith*, 703 F.2d at 950 n. 15.

In this case, the district court held that, under the intracorporate conspiracy doctrine, there could be no conspiracy between HCH and its medical staff or SHH and its medical staff.[3] Relying on *Potters* and *Smith*, the court declined to adopt the independent personal stake exception.

Plaintiffs contend that the district court erred in concluding that the intracorporate conspiracy doctrine dictated that there could be no antitrust conspiracy between a hospital and its medical staff. They first argue that the doctrine does not apply because the defendant members of the medical staff are not agents of the hospital. They also contend that, even if the doctors are agents of the hospital, they are still capable of conspiring with the hospital under the independent personal stake exception.

1. *The Agency Status of the Medical Staffs*

The issue whether the individual members of a hospital's medical staff should be treated as agents of the hospital for antitrust purposes when making a recommendation concerning an application for staff privileges is a difficult one. Under traditional concepts of agency, members of a hospital's medical staff who, acting at the hospital's request, make a recommendation concerning an application for privileges ordinarily would be acting as agents for the hospital. It is certainly legitimate for a hospital to seek advice from its medical staff concerning the competence of a person seeking privileges at the hospital and the risks that may be incurred by the hospital if privileges were granted. On the other hand, the premise underlying the intracorporate conspiracy doctrine, that agents of a firm share a unity of economic purpose with the firm, does not necessarily apply when viewing the relationship between a

---

**3.** In so holding, the district court cited to, and quoted extensively from, the portion of the Third Circuit's opinion in *Weiss* that held that a hospital could not conspire with its medical staff since they were not competitors. However, the court did not discuss the portion of the

*Weiss* opinion in which the court of appeals held that the individual members of a hospital's medical staff could conspire with each other when making a staff privileges recommendation.

hospital and its medical staff. The members of a medical staff are not salaried employees of the hospital but are independent medical practitioners, some in direct competition with each other and with applicants for privileges. There is certainly some danger of anticompetitive decision-making when a group of physicians recommends to the hospital that an applicant who is in competition with those physicians be denied privileges at the hospital.

■ For the most part, the Third Circuit's reasoning in *Weiss* seems to best achieve the objectives of the Sherman Act. Accordingly, the intracorporate conspiracy doctrine prevents a finding of conspiracy between a hospital and its medical staff but, in certain situations, does not preclude a conspiracy among individual members of the medical staff. Section 1 of the Sherman Act is concerned only with concerted action among competitors and not the coordinated activities that occur within a single firm. As the *Weiss* court held, when determining whether the intracorporate conspiracy doctrine applies to an alleged conspiracy between a hospital and its medical staff, there are no strong antitrust concerns that would warrant a departure from traditional concepts of agency since the hospital and the medical staff are not competitors. The fact that the medical staff may have acted with anticompetitive motives is not sufficient to warrant a finding that a hospital's decision to accept the staff recommendation is an antitrust conspiracy.

In contrast, the individual members of a hospital's medical staff are in many cases direct competitors with each other. We do not, however, agree with the *Weiss* court's conclusion that a hospital's medical staff can never be considered a single economic entity for purposes of antitrust analysis. The fact that medical staff members may be in competition with each other does not mean that every decision of the medical staff warrants scrutiny under section 1 of the Sherman Act. When the staff as a group makes decisions or recommendations for the hospital in areas that do not affect the market in which they compete as individuals, there is no reason not to treat them as agents of the hospital. However, when competing physicians are making privilege recommendations concerning another competitor, sufficient anticompetitive concerns are raised to warrant a conclusion that the members of the medical staff are not acting as agents of the hospital for purposes of applying the intracorporate conspiracy doctrine to preclude a conspiracy among staff members.[4]

It remains then to apply these principles to the facts in this case. With respect to the allegations that HCH and SHH conspired with their respective medical staffs, for the reasons stated above, we conclude that the members of the medical staff were acting as agents of the hospital and that, therefore, the intracorporate conspiracy doctrine is controlling.

■ In addition, with respect to the allegation that Dr. Shackleford conspired with the other pediatricians on the HCH medical staff, we find that Dr. Shackleford was acting as an agent of HCH. Although Dr. Shackleford is a competitor of the other pediatricians on the HCH medical staff, their actions regarding plaintiffs' application for privileges at HCH do not relate to the market in which they compete as individuals since NMA competes with obstetricians, not pediatricians. Accordingly, the intracorporate conspiracy doctrine also applies to this allegation.

■ We believe, however, that with respect to the allegation that Drs. Melkin, Baer, and Andrews conspired with each other and other members of the SHH medical staff, the district court erred in concluding that Drs. Melkin, Baer, and Andrews

---

4. This position is not inconsistent with reported opinions of this court. In *Potters,* the court found only that the intracorporate conspiracy doctrine prevented a finding that a hospital conspired with a member of its medical staff. 800 F.2d at 573. In *Smith,* the court held that there could be no conspiracy among a number of physicians operating in a group practice. The court emphasized that the physicians were not independent practitioners competing among themselves but were members of a professional corporation operating toward one economic goal. 703 F.2d at 950–51.

were agents of SHH. These doctors are competing obstetricians alleged to have joined together to cause SHH to deny privileges to a competitor and, therefore, are not agents of SHH for purposes of applying the intracorporate conspiracy doctrine.

## 2. The Independent Personal Stake Exception

■ Having concluded that the intracorporate conspiracy doctrine governs plaintiffs' allegations that the medical staffs conspired with the hospitals, we must next determine whether to consider the circumstances under the independent personal stake exception, as urged by plaintiffs. We are not inclined at this point to follow several other circuits in adopting this exception in view of substantial policy reasons for not doing so. *Smith,* 703 F.2d at 950. We are not convinced that an agent acting with anticompetitive motives due to some independent personal stake raises sufficient antitrust concerns to warrant abandoning the traditional rule that a principal cannot conspire with one of its agents. *See also* P. Areeda, *Antitrust Law* ¶ 1471 (1986). Accordingly, we believe that the district court correctly granted summary judgment in favor of defendants HCH, SHH, and Dr. Shackleford.

## B. Conspiracy Among Members of SVMIC

■ One of the means the defendant physicians allegedly used to prevent a qualified obstetrician from cooperating with nurse midwives was for Dr. Hibbett and physician members of SVMIC to cancel Dr. Martin's malpractice insurance because of his contract with nurse midwives.

On this claim, the district court granted summary judgment in favor of defendant SVMIC, holding that SVMIC must be viewed as a single entity when it decided to terminate Dr. Martin's coverage. In doing so, the court reversed the position it had previously taken in denying SVMIC's motion to dismiss. *See Nurse Midwifery Assocs. v. Hibbett,* 549 F.Supp. 1185 (M.D. Tenn.1982). In that earlier decision, the district court thought that

the existence of concerted action by a single corporation such as SVMIC is not, as a matter of law, precluded. Because SVMIC is owned and operated exclusively by its physician policyholders, who have elected a Board of Directors also dominated by physicians, and is closely affiliated with the Tennessee Medical Association, SVMIC may be considered capable of concerted action.... Indeed, in view of the member control of SVMIC, SVMIC may be considered the agent of its physician policyholders....

*Id.* at 1190 (citations omitted).

But, in reversing itself, the district court pointed to *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). In that case, the Supreme Court held that an agreement among competing physicians which set, by majority vote, maximum fees that they would accept as full payment for services provided for patients insured by approved insurers was per se unlawful under section 1 as a horizontal price-fixing conspiracy. In distinguishing the "foundations" set up by the physicians to administer the agreement from other entities to which it had not applied the per se rule, the Supreme Court utilized the language relied upon by the district court:

> Each of the foundations is composed of individual practitioners who compete with one another for patients. Neither the foundations nor the doctors sell insurance, and they derive no profits from the sale of health insurance policies. The members of the foundations sell medical services. Their combination in the form of the foundation does not permit them to sell any different product. Their combination has merely permitted them to sell their services to certain customers at fixed prices and arguably to affect the prevailing market price of medical care.

> The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures,

the partnership is regarded as a single firm competing with other sellers in the market. The agreement under attack is an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers. It is true that some are surgeons, some anesthesiologists, and some psychiatrists, but the doctors do not sell a package of three kinds of services. If a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing agreement among the doctors would be perfectly proper. But the fee agreements disclosed by the record in this case are among independent competing entrepreneurs. They fit squarely into the horizontal price-fixing mold.

*Id.* at 356–57, 102 S.Ct. at 2479–80.

On its face, this language would appear to support the district court's apparent conclusion that, when the competing physicians joined together to sell malpractice insurance—a product different from the medical services over which they normally competed among themselves and with other providers—they operated as a single entity pursuing a complete unity of interest, rather than as the independent actors essential to the existence of a conspiracy. That reasoning would be persuasive if the selling of the different product had triggered a complaint that the defendants were restraining competition among sellers of malpractice insurance. But, here, plaintiffs allege that the anti-competitive effect of defendants' conduct is in the same area in which the physicians combining to form SVMIC usually compete—providing medical services. If these allegations are true, then the defendants' conduct cannot be characterized as that of former competitors operating a joint venture which competes in the market with other sellers of malpractice insurance. Instead, it will be the conduct of physicians who retain their identity as individuals who compete among themselves and with plaintiffs in providing maternity care services and combine to unreasonably restrain competition in that field

by denying malpractice insurance coverage to a competing maternity care provider.

Accordingly, the language quoted from *Maricopa* does not compel the conclusion arrived at by the district court that, as a matter of law, "SMVIC [sic] must be viewed as a single entity." Since SVMIC and its members were theoretically capable of conspiring, the question remains upon remand whether physicians who had previously pursued their own interests separately, in this instance combined to unlawfully restrain competition among providers of maternity care.

### C. Conspiracy Between Dr. Hibbett and Vanderbilt

A plaintiff in an antitrust suit need not introduce any direct evidence of an alleged conspiracy. "[B]usiness behavior is admissible circumstantial evidence from which the fact-finder may infer agreement." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). A conspiracy can be established by showing that business behavior evidenced "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The fact that a group of defendants' conduct is consistent with an illegal conspiracy does not, in itself, support an inference of antitrust conspiracy. *Id.; Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). For a jury to be able to reasonably infer that an illegal conspiracy existed, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356 (quoting

*Monsanto*, 465 U.S. at 764, 104 S.Ct. at 2738).

■ The district court found that plaintiff had produced circumstantial evidence demonstrating that Vanderbilt's and Dr. Hibbett's conduct was consistent with an illegal conspiracy. The court noted that plaintiffs had introduced evidence (1) that Vanderbilt and Dr. Hibbett had an opportunity to conspire and (2) of a motive on Vanderbilt's part to conspire with Dr. Hibbett, namely, a desire to maintain its advantageous relationship with Baptist Hospital, a hospital at which Dr. Hibbett had some influence. However, the district court also found that the conduct alleged was equally consistent with the hypothesis that Vanderbilt denied plaintiffs' applications for independent business reasons, "namely the promotion of Vanderbilt as a tertiary care center and a high quality medical education and residency training institution." The court found, therefore, that summary judgment in favor of Dr. Hibbett was warranted on this claim.

Plaintiffs contend that the district court erred in granting summary judgment to Dr. Hibbett. In support of this argument, they emphasize the evidence demonstrating that Dr. Hibbett, an avowed opponent of nurse midwives, had discussions with members of the medical staff of Vanderbilt and that Vanderbilt had great incentive to accommodate Dr. Hibbett's views due to his relationship with Baptist Hospital. Plaintiffs do not, however, explain how their evidence "tends to exclude the possibility" that Vanderbilt denied the nurse midwives' applications for the reasons it gave them: (1) that its staff members had historically been employees of the institution; and (2) that Vanderbilt's commitment to tertiary care made it inappropriate for the hospital to grant privileges to nurse midwives. Plaintiffs argue that such evidence is unnecessary because "it is clear from a review of the relevant cases on the use of business behavior as circumstantial evidence of an agreement that no uniformity exists as to its necessary components." This argument is without merit given the clear pronouncements in *Monsanto* and

*Matsushita.* Accordingly, the district court did not err in granting summary judgment on the claims concerning an alleged conspiracy between Vanderbilt and Dr. Hibbett.

### D. Conspiracy Between SHH and HCH

■ The district court denied summary judgment on plaintiffs' claim that SHH and HCH had conspired together. The court did not find any direct evidence of any conspiracy but found that the circumstantial evidence of parallel business activity was sufficient to allow the claim to go to the jury. HCH and SHH contend that there is no evidence that their actions were parallel, that they had no incentive to conspire, and that their decisions were not contrary to their independent self-interests.

While this court reviews a grant of summary judgment under a de novo standard, appellate review of a denial of summary judgment is governed by an abuse of discretion standard. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir.1988). After reviewing the relevant facts, we are unable to say that the district court abused its discretion in denying summary judgment.

### IV.

For the reasons stated, we reverse the district court's decision granting summary judgment in favor of SVMIC and of Drs. Melkin, Baer, and Andrews and affirm the decision in all other respects. This case is remanded for further proceedings consistent with this opinion.