PURGESS, Plaintiff,

v.

SHARROCK, et al., Defendants.

No. 91 Civ. 621 (LJF).

United States District Court,
S.D. New York.

Oct. 29, 1992.

William J. Thomashower, Kaplan, Thomashower & Landau, New York City, for plaintiff.

Beth D. Jacob, Carter, Ledyard & Milburn, New York City, for defendants.

FREEH, District Judge.

Prior to trial, plaintiff Jan Purgess ("Purgess") moved *in limine* to exclude evidence regarding any of his cases which were not identified at the time of his discharge from The Hospital for Special Surgery ("HSS").[1] Defendants Nigel Sharrock ("Sharrock") and HSS opposed that motion and, pursuant to Court instruction,

---

**1.** Both parties also raised other evidentiary issues in pretrial motions *in limine*. Where ap-propriate, the Court issued oral rulings on those motions on the first day of trial.

included in their trial memorandum of law all claims for summary judgment. Also pursuant to Court instruction, Purgess included his opposition to the motion for summary judgment in his trial memorandum. For the reasons stated on the record on October 19, 1992 and below, plaintiff's motion to exclude evidence is denied. Defendants' motion for summary judgment is granted as to Counts 1, 2, 4, 5, 6, 8, 10, and 13 of the complaint. The motion is denied, however, as to Counts 2, 7, 9, and 11, which counts shall proceed to trial.[2]

## BACKGROUND

Purgess, a Board-certified anesthesiologist, was hired by HSS in October 1988. After only a few months on the job, Purgess' employment was terminated by the hospital, allegedly on the grounds that he had failed to perform adequately.

Purgess disputes defendants' characterization of his performance, and filed this action, claiming that Sharrock, HSS and other members of the hospital staff (a) conspired to fix prices, in violation of § 1 of the Sherman Act (Count 1); (b) conspired to restrain competition by terminating Purgess' employment at HSS, also in violation of § 1 of the Sherman Act (Count 2); (c) attempted to and conspired to monopolize the market for orthopedic anesthesiological services in the New York metropolitan area, in violation of § 2 of the Sherman Act (Count 3); and (d) engaged in and conspired to engage in a pattern of racketeering activity, in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)–(d) (Counts 4 and 5). Purgess further contends that defendants fraudulently induced him to enter an employment contract with HSS (Count 6), breached that employment contract (Count 7), wrongfully withdrew his staff privileges and academic affiliation (Count

8), defamed him after they terminated his employment (Count 9), engaged in unfair competition (Count 10), tortiously interfered with his economic opportunities (Count 11), and violated 42 U.S.C. § 1983 and his constitutional right to due process (Count 13). Defendants challenge the adequacy of each of these claims.

## DISCUSSION

### A. *Motion in Limine*

■ Purgess moved to exclude evidence of any of his cases which were not identified at the time of his discharge on the grounds that (1) after-the-fact justifications for his discharge are prohibited as a matter of law; (2) the New York Public Health Council ("PHC"), which has special expertise in the area, has already reviewed Purgess' performance in the challenged cases; (3) the additional cases were never raised in the hospital's peer review process or before any state agency and were not considered at the time of Purgess' termination; (4) the additional cases were not timely disclosed; and (5) the additional cases raise collateral issues, which will confuse the jury. Because none of these asserted grounds require that the evidence be excluded in its entirety, the motion is denied at this time. Purgess may renew his objections to that evidence at the appropriate time during trial.[3]

In arguing that defendants' "after-the-fact justifications" for his discharge are precluded as a matter of law, Purgess relies on the Supreme Court's decision in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Contrary to Purgess' claims, however, *Silver* does not state that such justifications—if in fact that is what the evidence at issue should be considered—are inadmis-

---

**2.** Plaintiff withdrew his claim for intentional infliction of emotional distress (Count 12). (Plaintiff's Trial Memo. at 78 n. 17).

**3.** Subsequent to the Court's oral ruling regarding the motion *in limine,* defense counsel represented to the Court that, contrary to their earlier position, defendants would not seek to introduce evidence regarding fifty-six (56) of Purgess'

cases at HSS. Rather, defense counsel stated that she would rely on approximately six (6) cases. (Tr. at 1263–64). Presumably, that representation negates most of Purgess' objections. The Court notes, however, that both counsel have, throughout this case, been dilatory in responding to legitimate discovery requests and in identifying trial evidence.

sible as a matter of law. Rather, the Court in *Silver* merely stated that it need not consider the defendant's proffered evidence, given its finding that the defendant could not present any justification which would negate its liability. 373 U.S. at 363, 83 S.Ct. at 1260 ("Since it is perfectly clear that the [defendant] can offer no justification ... for its collective action ... and that the Exchange has therefore violated § 1 of the Sherman Act, ... there is no occasion for us to pass upon the sufficiency of the reasons which the [defendant] later assigned for its action."). Accordingly, *Silver* is not binding here.

The Court also finds that the PHC's determination regarding Purgess' conduct at HSS does not preclude defendants from introducing evidence regarding his cases. It is undisputed that the PHC's proceedings are not adversarial, and thus that HSS' ability to present its view of the matter before the PHC was substantially circumscribed. Moreover, the issue, as presented to the PHC, was not identical to that presented here.

Finally, the Court finds that the additional cases, although disclosed late in the litigation, were produced sufficiently in advance of trial that they may be admitted into evidence. A question of fact may exist as to whether defendants actually considered the additional cases in determining that Purgess' employment at HSS should be terminated. However, that question goes to the weight to be accorded the evidence, not its admissibility. Because the evidence regarding Purgess' additional cases is clearly relevant to the issues here and because the Court does not find that such evidence will confuse the jury and/or prejudice Purgess, defendants may introduce that evidence at trial.

**B.** *Motion for Summary Judgment*

1. Sherman Act Antitrust Violations (Counts 1, 2, and 3)

■ Defendants argue that plaintiff's federal antitrust claims fail as a matter of law because (1) plaintiff has no standing to bring those claims; (2) plaintiff cannot establish a conspiracy under the federal antitrust laws; (3) plaintiff cannot show a restraint on trade; and (4) the Hospital for Special Surgery has insufficient market power to monopolize any relevant market.[4]

(a) *Antitrust Standing Generally*

■ Section 4 of the Clayton Act grants private rights of action under the antitrust laws, stating that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a). Despite this broad language, the Supreme Court has limited the class of parties entitled to bring such actions, and has required potential plaintiffs to demonstrate more than a mere "injury in fact." *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983). Rather, antitrust plaintiffs must show (1) that they have suffered an "antitrust injury," and (2) that they are otherwise proper plaintiffs to bring the action at issue. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1449 (11th Cir.1991); *Volvo No. America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988).

The Supreme Court has defined "antitrust injury" as

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would likely cause.'

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ However, even if a plaintiff establishes antitrust injury, he or she must also

---

**4.** To the extent that plaintiff asserts any claims under New York's equivalent of the Sherman Act (the "Donnelly Act," New York General Business Law § 340), those claims must be dismissed. The New York Court of Appeals has held that licensed professionals "are exempt" from that Act. *People v. Roth,* 52 N.Y.2d 440, 438 N.Y.S.2d 737, 420 N.E.2d 929 (1981).

show that they are "an efficient enforcer of the antitrust laws." *Todorov*, 921 F.2d at 1449. Among the other factors that courts consider in evaluating whether a particular plaintiff is appropriate are (1) the directness of the asserted injury; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims of the alleged conduct, in order to avoid duplicative recoveries. *Volvo*, 857 F.2d at 66 (*quoting Associated General Contractors*, 459 U.S. at 540–46, 103 S.Ct. at 909–12 (1983)).

### (b) *Standing to Raise Price Fixing/Monopolization Claims*

■ The parties have not cited—and the Court has been unable to locate—any Second Circuit cases discussing antitrust standing in the context presented here.[5] However, other courts have addressed antitrust claims by doctors whose hospital privileges were either denied or terminated, and have found (1) that the plaintiff physicians had not demonstrated any "antitrust injury" or harm to competition generally, but merely injury to themselves as competitors, damages which are not actionable under the antitrust laws; and (2) that the plaintiff physicians were not efficient enforcers of the antitrust laws, given that consumers of medical services and/or the government would have a greater interest

in ensuring quality medical services at competitive prices. *See Todorov*, 921 F.2d at 1448; *Robles v. Humana Hospital Cartersville*, 785 F.Supp. 989, 999 (N.D.Ga. 1992); *Anesthesia Advantage, Inc. v. The Metz Group*, 759 F.Supp. 638, 646 (D.Co. 1991).

■ The same holds true in this case, at least with regard to Purgess' price fixing and monopolization claims. Purgess has not and cannot claim any injury to competition generally even if he was terminated as part of a price fixing conspiracy or attempt to monopolize the market for orthopedic anesthesiological services. The only harm asserted by Purgess is his inability to continue working at HSS and to continue benefiting from the hospital's allegedly anticompetitive conduct. But the antitrust laws were enacted for the "protection of competition not competitors."[6] *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

Moreover, patients at HSS or the government would appear to be superior plaintiffs to raise these claims. This is not to say that, should Purgess succeed on his claims here, patients would not benefit. However, a potential increase in the competitiveness of the market is not determinative of the antitrust standing issue. As Judge Tjoflat stated in *Todorov*:

> We recognize that [plaintiff's] entrance into this market might have the effect of helping consumers ... [I]t is possible that [plaintiff's] presence in the market would spur competition, resulting in lower prices for CT scan patients. It is also

---

**5.** Those New York district court cases discussing medical facilities did not involve physicians whose hospital privileges had been denied or terminated. *See Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.*, 725 F.Supp. 669, 677 (N.D.N.Y.1989) (radiology practice challenging exclusion from HMO; finding limited antitrust standing); *Westchester Radiological Associates v. Empire Blue Cross and Blue Shield, Inc.*, 659 F.Supp. 132, 137 (S.D.N.Y.1987) (hospital-based radiologists challenging Empire's billing rules; standing found to raise monopolization claims); *Addino v. Genesee Valley Medical Care, Inc.*, 593 F.Supp. 892, 901 (W.D.N.Y.1984) (podiatrist members of HMO challenging HMO medical rates; standing not expressly discussed).

**6.** To the extent that Purgess claims defendants engaged in a price fixing scheme, the only injury he suffered was an inability to participate in that scheme. To the extent that Purgess claims defendants attempted to or conspired to monopolize the market for orthopedic anesthesiological services, the only injury he suffered was an inability to become a member of that alleged monopoly and to charge supracompetitive prices. However, as the 11th Circuit has noted, "[t]he inability of a competitor to benefit from anticompetitive conduct is not the type of market distortion that the antitrust laws were promulgated to correct." *Todorov*, 921 F.2d at 1454.

possible that even if [plaintiff] were driven from this market, entry barriers, which previously restricted the supply of radiologists would have been removed, opening the way for free and unrestrained competition.

These arguments, however, have not been put forth by [plaintiff]; his motive for seeking privileges to provide CT scan services is not so altruistic. [Plaintiff] is simply looking to increase his profits, like any competitor. As such, [plaintiff] is a particularly poor representative of the patients; indeed, his interests in this case are so at odds with the patients' interests that it is unlikely that he would have standing under article III of the Constitution to present their claims.

[921 F.2d at 1454–55].

Because Purgess has not established either an antitrust injury or his adequacy as an antitrust plaintiff, the Court finds that he has no standing to assert price fixing or monopolization claims against defendants, and those claims must be dismissed.

#### (c) *Standing to Raise Group Boycott Claim*

■ It does not appear that defendants challenge Purgess' standing to raise a claim of group boycott or concerted refusal to deal. (*See* Defendants' Trial Memo. at 24) (discussing only price fixing and monopolization claims). That is likely because Purgess does have standing to assert such a claim. Purgess alleges that HSS and its anesthesiologists conspired to exclude him as a competitor, and that the conspiracy had the effect of reducing competition in the market for anesthesiological services in the New York metropolitan area. Assuming that Purgess can prove that his alleged harm—being terminated from the hospital—also reduced competition between New York-area anesthesiologists, Purgess will have established an antitrust injury. Pur-

gess is also the proper party to raise the group boycott/concerted refusal to deal claim, given that, as the competitor excluded by the hospital's medical staff, he has been directly injured by the alleged conduct. Accordingly, the Court finds that Purgess has standing to raise that claim.

#### (d) *Adequacy of Refusal to Deal Claim*

■ Although defendants concede Purgess' standing to raise a claim for concerted refusal to deal, they argue that they are entitled to judgment as a matter of law in any event because (1) plaintiff cannot establish a conspiracy; and (2) plaintiff cannot establish a restraint on trade.

With regard to the conspiracy issue, defendants contend that, like a corporation and its officers or employees, a hospital and its medical staff cannot conspire for purposes of Section 1 of the Sherman Act, at least when the medical staff acts as an agent of the hospital. (Defendants' Trial Memo. at 25). Although the Second Circuit has not ruled on this question, other circuit court have disagreed on the issue. The Third, Fourth and Sixth Circuits have found that, at least as a general rule, a hospital cannot conspire with its medical staff.[7] *See Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 703–04 (4th Cir. 1991) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992; *Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605, 614 (6th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991); *Weiss v. York Hospital*, 745 F.2d 786, 816–17 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). *See also Potters Medical Center v. The City Hospital Assoc.*, 800 F.2d 568, 573 (6th Cir.1986). The Eleventh and Ninth Circuits disagree, and have concluded that a hospital and its medical staff are legally separate entities which can conspire with one another. *See Bolt v.*

---

7. In the corporate context, courts have suggested a possible exception to that rule and have stated that a conspiracy between a corporation and its employee could exist if the employee has "an independent personal stake in achieving the object of the conspiracy." *Nurse Midwifery*, 918 F.2d at 613 (and cases cited). However, that exception would not apply in this case, given that there is no claim that the doctors had the power to implement their allegedly anticompetitive scheme. *See Potters Medical Center v. City Hospital Ass'n*, 800 F.2d 568, 573 (6th Cir.1986) (under theory of independent personal stake, the agent or officer held capable of conspiring must have "the power to institute the anticompetitive policy for his corporation").

*Halifax Hospital Medical Center,* 851 F.2d 1273, 1280 (11th Cir.1988) (Tjoflat, J.), *vacated and superseded on other grounds,* 891 F.2d 810 (11th Cir.), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990); *Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440, 1449–50 (9th Cir. 1988).

Those courts finding that a hospital cannot generally conspire with its medical staff rely in substantial part on the fact that the medical staffs at issue, like corporate employees or agents, had been empowered to make privilege decisions on behalf of the hospitals. *See Oksanen,* 945 F.2d at 703; *Nurse Midwifery,* 918 F.2d at 613; *Weiss,* 745 F.2d at 817. In this case, however, the exact authority delegated to Sharrock and the other members of the HHS staff remains unclear.

Purgess alleges that Sharrock and the other doctors conspired to have him terminated from the hospital so that (1) they could have a larger number of cases and thus make more money; and (2) they could continue charging supracompetitive prices. Purgess also contends that the Board of Trustees approved Sharrock's recommendations without question because the hospital wanted to continue receiving certain funds Sharrock required department members to pay to the hospital. If these allegations are true, Sharrock and the other HSS anesthesiologists may not have been acting as the hospital's agents—at least with regard to Purgess—and thus may have been capable of conspiring with the hospital to terminate his privileges. *See Oltz,* 861 F.2d at 1450 ("Although the [doctors] may have been agents of [the hospital] for some purposes, their interests were not as wed as the ties between a corporation and its officers or employees ... The [doctors] were independent contractors pursuing their personal economic interests when they pressured [the hospital] to eliminate Oltz as a direct competitor.").

The question of Sharrock's and the other doctors' authority to act on the hospital's behalf is a question of fact, which must be resolved at trial. If the evidence indicates that Sharrock and the other staff members were acting within the scope of their authority when they recommended that Purgess be terminated, there could not have been a conspiracy between those staff members and the hospital, and the group boycott claim must also be dismissed. If, on the other hand, Purgess demonstrates that Sharrock and the other staff members were not acting within the scope of their authority when they convinced the Board of Trustees to terminate Purgess, then such a conspiracy is legally possible. Whether Purgess is able to prove such a conspiracy is, of course, a separate issue.

2. RICO/Conspiracy to Commit RICO (Counts 4 and 5)

■■■■ In order to establish liability under RICO, Purgess must show: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invest[ed] in, or maintain[ed] an interest in, or participate[d] in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1983). Because Purgess cannot establish the third element of his claims—that defendants engaged in a pattern of racketeering—those claims must be dismissed.[8]

■■■ A RICO "pattern" will not be found "without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity." *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24, 25 (1989). As the Supreme Court has noted, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a

---

**8.** Defendants also challenge (1) plaintiff's ability to demonstrate injury resulting from the alleged RICO violations; and (2) the validity of the alleged predicate acts. (Defendants' Trial Memo. at 39, 42). Given the Court's finding with regard to the pattern of racketeering element, we need not address these claims.

series of related predicates extending over a substantial period of time." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) (citations omitted). However, the Court has emphasized the requirement that the predicate acts extend over a substantial period of time; "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the] requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

■ In this case Purgess challenges conduct which occurred during the brief period of time during which he was on staff at HSS. Purgess makes no allegations that the conduct continued beyond that period, or that it threatened to do so. Accordingly, Purgess has failed to establish a "pattern" of racketeering activity and his RICO claims must be dismissed.[9]

### 3. Fraudulent Inducement (Count 6)

■ Purgess' fraudulent inducement claim must also be dismissed given that it merely restates his breach of contract claim. "It is well settled under New York law that there can be no cause of action for fraud when the only fraud alleged arises from a breach of contract claim." *Russo v. Friedman*, 1992 WL 196791 at *4 (S.D.N.Y.1992). Here, Purgess claims that Sharrock convinced him to leave his position at New York University ("NYU") and join HHS by falsely representing the salary and benefits he would enjoy at HHS, while never intending to fulfill those promises. To the extent that Purgess claims that defendants never intended to fulfill their contractual obligations, that is merely another way of stating that defendants breached their contract. *Id.* at *5. Accordingly, Purgess' fraudulent inducement claim has no merit.

### 4. Breach of Contract (Count 7)

■ Although Purgess asserts that he is entitled to judgment as a matter of law on his breach of contract claims (Plaintiff's Trial Memo. at 66), questions of fact exist as to whether the Hospital's failure to provide him with a hearing prior to termination or its failure to keep him on staff for at least a year constitute breaches of the parties' agreement. As a result, this claim must proceed to trial.

### 5. Wrongful Withdrawal of Privileges and Academic Affiliation (Count 8)

■ As defendants properly note, this claim must be dismissed because there does not appear to be any cause of action for "wrongful withdrawal of privileges and academic affiliation" under New York law.

### 6. Defamation (Count 9)

■ Defendants contend that Purgess' defamation claim must be dismissed because (1) the statements at issue are privileged; (2) Purgess consented to the making and publication of the statements and thus waived any claim of defamation; and (3) the statements are true.[10] (Defendant's Trial Memo. at 65). Because questions of fact remain in dispute as to all of these claims, summary judgment is not appropriate and the claims must proceed to trial.

■ Under New York law, "any communication made in the discharge of a private or public duty, whether legal or moral, is privileged." *Greenfield v. Kanwit*, 546 F.Supp. 220, 227 (S.D.N.Y.), *aff'd*, 714 F.2d 113 (2d Cir.1982). That privilege is not absolute, however, and may be overcome if the plaintiff can establish that the slanderous statement was motivated by actual malice. *Id.*

---

**9.** Dismissal of plaintiff's substantive RICO claim (Count 4) mandates dismissal of the conspiracy to commit RICO claim (Count 5) as well. *See Farberware, Inc. v. Groben*, 764 F.Supp. 296, 307 (S.D.N.Y.1991).

**10.** In making this claim, Purgess apparently relies on four "statements" by defendants: (1) a letter dated January 6, 1989 from HSS to the

Director of the Office of Professional Medical Conduct of the New York Department of Health ("OPMC"); (2) a letter dated April 7, 1989 from HSS to NYU; (3) a letter dated April 25, 1989 from HHS to NYU; and (4) a report to state investigators which included four of Purgess' cases and one case with which Purgess was not involved. (Complaint ¶¶ 66, 73, 78 and 82).

In this case, Purgess has raised questions of fact regarding defendants' state of mind and intent in making the challenged statements. Accordingly, defendants are not entitled to summary judgment on qualified immunity grounds.

Questions of fact also exist as to (1) whether Purgess waived a claim of defamation when he signed certain forms provided by NYU and the New Jersey Board; and (2) whether the statements are actually true. These questions must be resolved by the jury at trial.

### 7. Unfair Competition (Count 10)

■■■ Defendants correctly argue, however, that the facts alleged here do not constitute unfair competition under New York law. Accordingly, Count 10 must be dismissed.

■■■ In New York, a plaintiff alleging unfair competition must demonstrate (1) that the defendants misappropriated the plaintiff's labors and expenditures; and (2) that the defendants acted in bad faith. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). While Purgess alleges, among other things, that defendants damaged his reputation, Purgess does not and cannot claim that defendants "misappropriated" anything. Moreover, unfair competition is a tort claim, and does not apply where, as here, a contract exists between the parties. Because this claim, like that for fraudulent inducement, arises out of and is indistinguishable from the breach of contract claim, it must also be dismissed.

### 8. Tortious Interference with Prospective Economic Advantage (Count 11)

■■■ Purgess claims that defendants obstructed him from obtaining a position as a anesthesiologist at NYU, in New Jersey, and elsewhere. To establish a claim for interference with prospective economic advantage, Purgess must demonstrate that "but for" the alleged interference, those other parties would have entered into a contract with him. *Gertler v. Goodgold,* 107 A.D.2d 481, 487 N.Y.S.2d 565, 572 (1st Dept.1985). In addition, Purgess must also show that defendants interfered "either with the sole purpose of harming [him] or by means that are dishonest, unfair, or in any other way improper." *PPX Enterprises v. Autofidelity Enterprises,* 818 F.2d 266, 269 (2d Cir.1987).

Purgess claims that "but for" defendants' letters to NYU in April 1989, he would have been reinstated to his prior position there. This causation standard is high, and one which Purgess ultimately may be unable to meet. Nevertheless, Purgess is entitled to try to prove that claim at trial. Defendants' motion for summary judgment on Count 11 is denied.

### 9. § 1983/Denial of Due Process (Count 13)

■■■ Defendants are correct, however, that Purgess' § 1983 and due process claims should be dismissed. Despite his claims to the contrary, Purgess cannot establish that defendants acted "under color of state law." Even if the state does regulate hospitals, such regulation does not establish the requisite state action. *See Schlein v. Milford Hospital, Inc.,* 561 F.2d 427, 428–29 (2d Cir.1977). State action depends on "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Because Purgess cannot show that the state "played any part in the formulation or implementation of the procedures and standards utilized by the Medical Staff and Board of Directors of the Hospital in reaching their decision" to terminate his employment, his due process claims under both federal and state law must be dismissed.

For the foregoing reasons, plaintiff's motion *in limine* is denied. Defendants' motion for summary judgment is granted as to Counts 1, 2, 4, 5, 6, 8, 10, and 13, which counts are dismissed. The motion for summary judgment is denied, however, as to

Counts 2, 7, 9, and 11, and those counts shall proceed to trial.

SO ORDERED.