Moses MUZQUIZ, Jr., M.D., Plaintiff–Appellant (94–1088), Cross–Appellee, Appellee,

v.

W.A. FOOTE MEMORIAL HOSPITAL, INC., Defendant–Appellee, Cross–Appellant (94–1089), Appellant (94–1420).

Nos. 94–1088, 94–1089 and 94–1420.

United States Court of Appeals, Sixth Circuit.

Argued and Submitted May 18, 1995.

Decided Nov. 16, 1995.

Richard G. Brewer (briefed), Bloomfield Hills, MI, for Moses Muzquiz, Jr. M.D.

Gregory G. Drutchas, Susan Healy Zitterman (argued and briefed), Jeremiah J. Kenney, Brian R. Garves, Kitch, Drutchas, Wagner & Kenney, Detroit, MI, for W.A. Foote Memorial Hosp., Inc.

Before: JONES and NORRIS, Circuit Judges; DOWD, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Dr. Moses Muzquiz appeals the judgment for Defendant W.A. Foote Memorial Hospital, Inc. ("Hospital") in this action (No. 94–1088). The Hospital cross-appeals, arguing that this court should assess attorney fees and costs pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11113, for this appeal. (No. 94–1089). The Hospital also appeals the district court's post-judgment order denying its application for the imposition of costs and attorney fees under HCQIA against Dr. Muzquiz (No. 94–1420). These appeals and cross-appeal have been consolidated for consideration in this court. For the reasons that follow we affirm the decision of the district court, and we deny the Hospital's request for attorney fees and costs for this appeal.

## I. Background

Dr. Muzquiz was born in Texas in 1932, is of Hispanic origin (Mexican–Indian), and graduated from a Mexican medical school in 1963. Dr. Muzquiz completed his residency in internal medicine/cardiology in 1968 and has performed invasive cardiology, including heart catheterizations, since that time.

In 1985, Dr. Muzquiz moved from Texas to Michigan and commenced a cardiology practice. From 1985–89, Dr. Muzquiz performed no cardiac catheterizations in Michigan, but did travel to Mexico for several weeks each year where he performed that procedure.

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

In January 1989, Dr. Muzquiz became a member of the provisional staff of Defendant Hospital, which is a not for profit institution. In late 1990, the Hospital was in the process of establishing a cardiac catheterization laboratory, which opened on January 1, 1991.[1] In November 1990, Dr. Muzquiz, along with ten other cardiologists, applied for invasive cardiology privileges at the Hospital, which would become available upon the opening of the cardiac catheterization laboratory. Dr. Muzquiz was the only applicant of Mexican–Indian extraction, and he was also the oldest applicant.[2]

At the time Muzquiz applied, the Hospital had adopted "Guidelines for Credentialling in Invasive Cardiology," that had been promulgated by the American College of Cardiology. As relevant to the instant case, the Guidelines state the following:

3. In addition to meeting the basic qualifications (above), a physician who seeks to independently perform invasive cardiology procedures shall meet the following specific requirements:

a. (i) Board certification

or

(ii) Active board candidacy

or

(iii) If a physician who completed his cardiovascular disease/cardiology fellowship training 4 or more years before . . .

or

(iv) If a graduate of medical school prior to July 1, 1975,

—primary devotion for ten or more years to the practice of cardiology with at least 25% of the practice devoted to performance of invasive cardiology procedures;

—holding of diagnostic catheterization privileges in good standing at an insti-

tution with a recognized invasive cardiology program;

—certification by the Program Director(s) of the invasive cardiology program(s) where currently practices of: successful performance of at least 1,000 invasive cardiology procedures (at least 500 of which were as primary physician), invasive cardiology morbidity and mortality within generally accepted limits (actual figures must be stated) and the absence of any disciplinary action related to the delivery of medical services

b. A favorable review [of] medical charts and films of patients for whom the physician served as primary physician for diagnostic catheterizations in the past year selected at random. The number of charts, the manner of random selection, and the reviewers shall be determined by the Service Director. If there is an expense of such review, it shall be borne by the physician seeking privileges. A physician who is board certified or an active board candidate, or whose skills are known on a first-hand basis by the Service Director may be exempted from this requirement in the discretion of the Service Director.

c. A favorable recommendation and certification of successful performance of at least 200 diagnostic catheterization procedures in the 4 years immediately preceding application by the Program Director(s) of the institution(s) where he currently holds clinical privileges in invasive cardiology and/or served a cardiovascular disease/cardiology fellowship (in the preceding year).

J.A. at 768–70, 1021–23.[3] Having graduated from medical school in 1963, and having completed his residency in internal medicine/cardiology in 1968, Dr. Muzquiz, in addition to satisfying certain basic requirements not at

---

1. A cardiac catheterization is an invasive procedure in which a small tube is inserted and fed through a blood vessel into the heart. Dye is then injected into the heart, which enables a physician to visualize through an x-ray the path the dye follows from the heart. The procedure is recorded on film.

2. Of the ten other cardiologists who applied for invasive cardiology privileges, three were in their

fifties like Dr. Muzquiz, although Dr. Muzquiz was the oldest by three years, two were in their forties, and the remainder were in their thirties. *Hosp. Br.* at 12.

3. The Guidelines have subsequently been modified, *see* J.A. at 1625–28, but the modifications are not relevant to the instant case.

issue in this case, had to satisfy requirements 3a(iv), b, & c, to qualify for invasive cardiology privileges.

The Hospital provides the following description of the general credentialling process at the hospital:

The credentialling process (whereby privileges are granted after an investigation by the hospital to ensure physician qualifications and competency), is statutorily mandated of hospitals and is conducted in order to ensure patient safety and the quality of care rendered in hospitals.

At Foote Hospital, as at most hospitals, the credentialling process for granting clinical privileges is established by the Medical Staff bylaws. The bylaws provide that a physician's application for privileges is submitted to the Medical Staff Coordinator who collects the initial documentation and evidence. The Coordinator then forwards the materials on to the Chairperson of the Department in which privileges are being sought (here the Department of Internal Medicine, of which Dr. Hurtado, who is of Hispanic descent, was Chair), to the Credentials Committee, and to the President of the Hospital (Mr. Paul Tejada, also of Hispanic descent).

Upon receipt and evaluation of all necessary information, the Internal Medicine Department (through the Internal Medicine Department's Executive Committee) and the Credentials Committee then make recommendations to the Medical Executive Committee, which is composed of the leadership of the Medical Staff. The Medical Executive Committee in turn then makes a recommendation to the Board of Trustees. Only the Board of Trustees has the power to make a final decision as to actually grant or deny privileges. Pursuant to the hospital bylaws, and as at all hospitals, the burden rests upon the physician applicant to obtain the required information for the credentialling process.

Hosp. Br. at 6–7 (references to the record omitted).

At the core of the instant dispute is the difficulty Dr. Muzquiz encountered in trying to meet requirement 3b.[4] Dr. Muzquiz had performed all of his recent cardiac catheterizations during his trips to Mexico. Consequently, to comply with requirement 3b, it was necessary to obtain the films and charts of the catheterizations he had performed in the past year from the hospital in Mexico. The Internal Medicine Executive Committee determined that ten films and charts needed to be reviewed. On September 18, 1991, already almost a year after Dr. Muzquiz had applied for catheterization privileges, Dr. Frank Morales, Administrator and CEO of the hospital in Mexico forwarded the English translation of ten patient charts. *See* J.A. at 1098–1124.

The Credentials Committee then sent all of Dr. Muzquiz's information to an outside consultant, Dr. Fierens, for a review and recommendation regarding Dr. Muzquiz's request for catheterization privileges. Dr. Fierens recommended review of properly authenticated catheterization films of Dr. Muzquiz's past four years experience prior to making a final assessment of Dr. Muzquiz's qualifications. J.A. at 1135–36.

On December 11, 1991, the Credentials Committee informed Dr. Muzquiz that they needed (1) a written explanation from Dr. Morales as to why the actual case logs and copies of the films corresponding to the ten translated charts sent were not available, and (2) copies of the actual medical records that had been translated. J.A. at 1141–42. Upon receipt and review of that documentation, the Committee was prepared to recommend Dr. Muzquiz for provisional cardiac catheterization privileges conditioned on a favorable evaluation of his first ten catheterization procedures. *Id.* In a letter dated December 31, 1991, Dr. Morales explained that the requested films were unavailable because the hospital followed a policy of giving the films to the patients at the time of discharge. J.A. at 1156. With respect to the original Spanish records of the charts, Dr. Morales explained that it was the policy of the hospital not to

---

**4.** It is not disputed that Dr. Muzquiz met all the other requirements set forth in the Guidelines for obtaining invasive cardiology privileges.

release the records. *Id.* He stated, however, that he had prepared the English translations himself, and that they were exact translations of the Spanish records. *Id.* The Credentials Committee determined that this was a satisfactory explanation and went forward with its recommendation.

On January 15, 1992, however, the Medical Executive Committee voted to reject the recommendation of the Credentials Committee with respect to the ten proctored cases, and instead recommended proctoring Muzquiz' first twenty-five cases. As noted in the minutes of that committee meeting,

> [t]his recommendation is based on information from the Journal of the American College of Cardiology, November 1, 1991, Volume 18, Number 5, Page 1166:
>
> > "If the time away from the cardiac catheterization has been 1–3 years, the physician should undergo a period of preceptorship, working under the direct observation of the laboratory director until the director can certify the competence of that individual. This work should include at least 25 cases with a variety of diagnoses."

J.A. at 1253.

Meanwhile, Dr. Muzquiz and the Credentials Committee were engaging in increasingly disharmonious correspondence over the nature of the ten-proctored cases arrangement. *See* J.A. at 1158, 1160, 1165, 1167.

On January 22, 1992, the Board of Trustees met and voted to approve the Medical Executive Committee's recommendation. On February 4, 1992, Tejada, the President of the Hospital, informed Dr. Muzquiz that his request for catheterization privileges had been granted in accordance with the recommendation of the Medical Executive Committee. Tejada also forwarded the curricula vitae of three independent physicians proposed by the hospital to be proctors for Dr. Muzquiz's first twenty-five cases.

On February 11, 1992, Dr. Muzquiz expressed disapproval of the selected proctors because he considered them to be direct competitors for consultations and other cardiovascular procedures. J.A. at 698–99. He thus again recommended "someone or some group from well beyond the same or contiguous geographical area to insure objectivity in the review process," and offered to help in the selection process. J.A. at 699. He also expressed reservations about the number of cases that were to be proctored. *Id.* On February 13, 1992, Dr. Muzquiz registered his strong objection to the twenty-five proctored cases requirement, and asked for reconsideration of the ten-proctored cases arrangement as initially recommended by the Credentials Committee. J.A. at 701–03. On March 17, Dr. Muzquiz met with representatives of the Hospital and refused to accept the terms of the provisional grant of catheterization privileges. On March 25, 1992, the Board of Trustees deemed the provisional grant of privileges withdrawn, and determined that if Dr. Muzquiz still wished to seek privileges that he would have to reapply. J.A. at 1273.

Dr. Muzquiz then brought suit in federal court. As originally filed by Dr. Muzquiz on September 21, 1992, and as amended on May 27, 1993, the complaint alleged seven counts, including claims for breach of contract, violations of Title VII, 42 U.S.C. § 2000e, violations of the Elliot–Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101–2804, a claim under 42 U.S.C. § 1983, an intentional infliction of emotional distress claim, and an antitrust claim. The breach of contract, § 1983, and antitrust claims were dismissed by the district court. The intentional infliction of emotional distress claim was withdrawn at trial. The remaining counts, the Title VII and Elliot–Larsen claims, were tried to a jury.

After two days of deliberation, the jury concluded that Dr. Muzquiz had not been discriminated against due to his age or national origin.[5] A judgment of no cause of

---

5. After giving the verdict, and with permission of the court, one of the jurors made the following statement on behalf of the jury:

We, as the jury, foresee that Dr. Muzquiz is a very qualified doctor. We would hope that Foote Hospital and Dr. Muzquiz would go forward speedily to honor his residence requirement of ten cases, six supervised and four proctored. J.A. at 2116.

action was entered on December 15, 1993. Dr. Muzquiz appeals this judgment and the Hospital has filed a cross-appeal (Case Nos. 94–1088/1089).

On March 24, 1994, the district court denied the Hospital's post-judgment motion for an award of attorney fees and costs under the Health Care Quality Improvement Act. The Hospital appeals this determination (Case No. 94–1420).

The appeals and cross-appeal have been consolidated for consideration in this court.

## II.  Discussion

### A.  Excluded Evidence

■ Dr. Muzquiz first argues that the trial court erred by excluding certain proffered testimony of Drs. Nicholas Bartz and Gregory Dale Casey. This court reviews a district court's decision to exclude evidence for an abuse of discretion. *Hill v. Marshall,* 962 F.2d 1209, 1214 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). On review, this court "must view the evidence in the light most favorable to its proponent, giving the 'evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Laney v. Celotex Corp.,* 901 F.2d 1319, 1320–21 (6th Cir.1990) (quoting U.S. v. *Schrock,* 855 F.2d 327, 333 (6th Cir.1988). "Abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Id.* at 1321. Even if there is an abuse of discretion, the decision of the district court will not be disturbed unless the error affected a substantial right of the parties. Fed.R.Civ.P. 61; *Rye v. Black & Decker Mfg. Co.,* 889 F.2d 100, 103 (6th Cir.1989).

■ The voir dire of Dr. Bartz revealed that he would have testified that in the summer of 1992 he overheard Dr. Adamczak, a member of the Medical Executive Committee, talking on the telephone with an unknown individual, and that Dr. Adamczak made certain, what Dr. Bartz believed to be derogatory, references to Dr. Muzquiz. To the best of his recollection, Dr. Bartz related that Dr. Adamczak said "[s]omething to the effect ... that ... Dr. Muzquiz went off to Mexico to get his heart cath and thinks he's

going to come back here and do heart catheterizations." J.A. at 1992. Dr. Bartz explained that the reason the conversation stood out to him was that it struck him as ironic that Dr. Adamczak, who went to medical school and trained in Mexico, was making these comments. J.A. at 1993. In refusing to admit this proffered testimony into evidence, the district court explained that the testimony was irrelevant because the alleged conversation took place subsequent to the denial of privileges and it provided no basis for inferring a discriminatory animus by the Hospital towards Dr. Muzquiz. J.A. at 1994. The Hospital argues that this testimony is not relevant to discriminatory intent because there is no suggestion that there was bias against Dr. Muzquiz's Mexican *heritage,* but at most there is a suggestion of bias against his *training* in Mexico. We agree that the testimony was not probative of a discriminatory intent on the part of the Hospital with respect to Dr. Muzquiz's national origin. We conclude that the district court did not abuse its discretion in determining that this proffered testimony was irrelevant, and thus inadmissible.

■ The voir dire of Dr. Casey, established that he had never been a member of any of the committees that were involved in the process of granting hospital privileges, nor had he ever had conversations about Dr. Muzquiz's application for catheterization privileges with anyone on any of those committees. J.A. at 1978–79. Dr. Casey was prepared to testify to his subjective belief that there was bias in the hospital system based on (1) his dispute with the hospital over a financial matter, *see* J.A. at 1979–81, and (2) a dispute between the Surgical Executive Committee, of which Dr. Casey was a member, and the Medical Executive Committee regarding credentialling criteria with respect to a Canadian physician, *see* J.A. at 1983–86. With respect to the latter situation, the surgery staff was of the view that the Canadian physician did not meet the established criteria, while the administration felt that the criteria should be changed so that the Canadian physician could meet them. It was Dr. Casey's view that if the physician seeking to be credentialled had been from

Pakistan or Nigeria or South America, that the administration's request to change the credentials would not have been made. J.A. at 1983–84.

In rejecting this evidence the district court concluded that Dr. Casey's subjective belief that minorities would be treated differently at the hospital was simply not probative of a discriminatory animus infecting Dr. Muzquiz's credentialling application. We agree. The district court did not abuse its discretion in ruling the proffered testimony inadmissible.

### B. Discriminatory Impact Theory

[redacted] Dr. Muzquiz next argues that the trial court erred in denying him the opportunity to argue the discriminatory impact with respect to his national origin of the requirement that Dr. Muzquiz provide cardiac catheterization films for review. To make a showing of disparate impact, a plaintiff must demonstrate that a facially neutral policy has a disproportionately negative effect on certain protected groups which cannot be justified by business necessity. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Dr. Muzquiz argues:

> [d]uring the course of trial, plaintiff counsel attempted to examine several defendant witnesses regarding the effect that this film review requirement had upon doctors whose experience was Mexican rather than American, where the films are available. The court refused to allow that inquiry and, further, the court refused to allow argument regarding the disparate impact of these rules upon doctors of Mexican heritage (Trial Transcript, Vol. VIII, pp. 851, 852).

Muzquiz Br. at 22. We find that the district court did not err in limiting this theory. Starting from the facially neutral requirement of the Credentialling Guidelines of providing films and charts, the most Dr. Muzquiz could show with respect to disparate impact would be a negative effect on those who *trained* in Mexico, and not those who were of Mexican *heritage.* Those who receive training in Mexico are simply not a protected class for purposes of discrimination analysis under Title VII or the Elliot–Larsen Civil Rights Act. *See* 42 U.S.C. § 2000e–2(k) (1988); Mich. Comp. Laws § 37.2202 (1985). The district court did not err in rejecting the disparate impact theory presented by Dr. Muzquiz below; nor is Dr. Muzquiz entitled to a rehearing on the new disparate impact theory he presents to this court.

### C. Antitrust Claim

[redacted] Dr. Muzquiz next argues that the trial court erred in dismissing his antitrust claim. The district court dismissed the claim on the ground that Dr. Muzquiz had failed to allege properly an antitrust claim, as set forth in this court's decision in *Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605 (6th Cir.1990), *opinion modified on reh'g.,* 927 F.2d 904, *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991).[6] In *Nurse Midwifery,* this court examined antitrust claims filed by nurse midwives against certain individual doctors with staff privileges at two different hospitals. The court initially noted that to establish a violation of section 1 of the Sherman Act, a plaintiff must first establish that there has been a conspiracy, and that "[n]ot every agreement or coordinated conduct between two or more entities constitutes a conspiracy under section 1." 918 F.2d at 612. The court then examined whether the intracorporate conspiracy doctrine, which holds that a corporation cannot ordinarily conspire with its agents or employees, applied to the situation before it. The court ultimately held that "*the* intracorporate conspiracy doctrine prevents a finding of conspiracy between a hospital and its medical staff but, in certain situations, does not preclude a conspiracy among individual members of the medical staff." 918 F.2d at 614 (emphasis added). In the instant case, the Hospital is the only defendant. As such, we agree with the district court that this court's holding in *Nurse Midwifery* precludes an

6. In fact the district court initially dismissed the claim on this ground, but allowed Dr. Muzquiz 15 days to amend his complaint, *see* J.A. at 2044–45. After Muzquiz amended the complaint, the district court dismissed the amended claim on the same grounds, *see* J.A. at 2050–61.

antitrust claim against the Hospital in this case.

### D. Breach of Contract Claim

■ Dr. Muzquiz next argues that the district court erred in dismissing his breach of contract claim. As Dr. Muzquiz explains in his appeal brief, this claim was "predicated upon the alleged violation by defendant hospital of its own credentialling procedures as outlined in its own by-laws and invasive cardiology credentialling criteria." Muzquiz Br. at 30. The district court granted the Hospital's motion for summary judgment on this issue, on the basis that Michigan law prohibits judicial review of staffing decisions by private hospitals as expressed in *Sarin v. Samaritan Health Center*, 176 Mich.App. 790, 440 N.W.2d 80 (1989). In *Sarin*, the Michigan Court of Appeals reviewed a plaintiff doctor's claim that the defendant hospital had breached its contract with the doctor by failing to follow its by-laws in terminating his staff privileges. 440 N.W.2d at 82.

Dr. Muzquiz argues that *Sarin* is distinguishable because he is not asking that the court "review the by-laws and criteria as established, but rather the court should review how those criteria and by-laws were applied (or not), as to Dr. Muzquiz." Muzquiz Br. at 32. We disagree. In *Sarin*, the court expressly stated the following:

> Although plaintiff contends that he is not asking for review of whether there was a violation of due process or fair procedure, we believe consideration of his breach of contract claim would necessarily involve a review of the decision to terminate and the methods or reasons behind that decision, thus making a mockery of the rule that prohibits judicial review of such decisions by private hospitals. For example, in *Veldhuis* [*v. Central Michigan Community Hosp.*, 142 Mich.App. 243, 369 N.W.2d 478 (1985)], we said:
>
> > "[T]he *Hoffman [v. Garden City Hospital–Osteopathic*, 115 Mich.App. 773, 321 N.W.2d 810 (1982)]] rule discussed above precludes judicial review of both a private hospital's decision on staff privileges and the method by which the hospital personnel reached that decision."

440 N.W.2d at 83. In light of this language, we find Dr. Muzquiz's effort to distinguish *Sarin* ineffectual. We affirm the district court's determination that the Michigan Court of Appeals' holding in *Sarin* bars Dr. Muzquiz's breach of contract claim in the instant case.

### E. Discovery Claims

■ Dr. Muzquiz next argues that the district court erred in imposing stringent limitations upon pretrial discovery, thereby denying him the opportunity for a fair trial. Dr. Muzquiz claims that he was prejudiced because his breach of contract claim, antitrust claim, and § 1983 claim were dismissed without his being allowed "meaningful discovery." *See* Muzquiz Br. at 34. We find his argument to be without merit because dismissal of these claims was based on legal determinations that could not have been altered by any further discovery. The breach of contract claim was barred by Michigan law, the antitrust claim was barred by Sixth Circuit precedent, and the § 1983 claim was barred by the fact that the hospital was not a state actor and could not otherwise be deemed as "acting under color of law" for purposes of that provision.

Furthermore, we question whether this claim is appropriately before this court since Dr. Muzquiz never filed any motion to compel discovery, and when Dr. Muzquiz eventually complained about certain standing confidentiality orders that had been issued by the court at the Hospital's request, the court altered the standing order to allow Dr. Muzquiz the discovery he requested (namely the credentialling files of the ten other physicians who had obtained cardiac catheterization privileges and the taking of depositions of certain non-parties). That Dr. Muzquiz was not more aggressive in his discovery requests is not the fault of the court, and he misrepresents the truth by suggesting that it was. We conclude that the district court did not abuse its discretion with respect to any discovery issues in this case. *See Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 354 (6th Cir.1984) (holding that order denying further discovery will be grounds for reversal only if it was abuse of discretion resulting in substantial prejudice).

## F. Attorney Fees and Costs Under HCQIA

The Hospital argues that this court should assess costs and attorney fees against Dr. Muzquiz under the Health Care Quality Improvement Act ("HCQIA") because his appeal is without foundation in fact or law, and that the district court erred in not assessing costs and attorney fees against Dr. Muzquiz under the HCQIA because his claims in that court were without foundation in fact or law. We will address these claims together, but in reverse order.

HCQIA, 42 U.S.C. §§ 11101–11152, was passed in response to certain Congressional findings as a means of encouraging good faith professional review activities. *See* 42 U.S.C. § 11101.[7] Section 11113 provides the following:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 U.S.C. § 11113.

The Hospital vigorously argues that the entirety of Dr. Muzquiz's action in the dis-

trict court was without foundation in fact or law, and thus the Hospital is entitled to attorney fees and cost under § 11113. The district court, in denying the Hospital's motion for costs and attorney fees, stated the following:

> Based on its knowledge of the record and the manner in which the case was litigated the Court is satisfied that, while plaintiff did not prevail, plaintiff's claim was not frivolous or without foundation and that plaintiff, in bringing his claim, did not act unreasonably. The jury's statement following the verdict indicates that its decision did not come easily.

J.A. (Case No. 94–1240) at 59–60.

The Hospital initially argues that (1) this court should review the district court's determination for clear error and not abuse of discretion because of the language of the statute and the public policy underlying the statute and (2) the district court should not be allowed to consider the jurors' post-verdict statement when making its fee award determination.[8] The language of the statute requires an award to the defendant only if the court first concludes that "the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith." 42 U.S.C. § 11113.[9] Two circuits have held that the appropriate standard of review of a district court's decision regarding the award of attor-

---

7. Specifically this section sets forth the following Congressional findings:

   (1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.
   (2) There is a national need to restrict the ability of incompetent, physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.
   (3) This nationwide problem can be remedied through effective professional peer review.
   (4) The threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.

   (5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review. 42 U.S.C. § 11101.

8. With respect to this latter issue, we conclude that whether or not it was appropriate for the court to consider the jury's post-verdict statement, it is clear that this is not the only basis for the district court's decision, and we will not consider the issue further as it is inconsequential to our ultimate determination of the attorney fees issue.

9. More accurately, the initial requirements to be satisfied for application of § 11113 are that the defendant meet the standards set forth in section 11112(a) and have substantially prevailed. Although Dr. Muzquiz argues that the Hospital has not met the standards of § 11112(a), we believe it has. Section 11112(a) requires the following:

ney fees and costs under the HCQIA is abuse of discretion. *See Smith v. Ricks,* 31 F.3d 1478, 1487 (9th Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1400, 131 L.Ed.2d 287 (1995); *Johnson v. Nyack Hosp.,* 964 F.2d 116, 123 (2d Cir.1992). We agree that abuse of discretion is the appropriate standard. In 1978, the Supreme Court in interpreting section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), held that "a district court may *in its discretion* award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was *frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."* *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (emphasis added). Two years later, the Supreme Court applied this same standard to attorney fee awards under 42 U.S.C. § 1988. *See Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980). Given the manner in which the language of 42 U.S.C. § 11113 follows the language of these holdings, we conclude that it is appropriate to review the award of attorney fees under 42 U.S.C. § 11113 in the same manner that we review the award of attorney fees under Title VII and under 42 U.S.C. § 1988. We thus review the district court's denial of the Hospital's request for attorney fees under HCQIA for an abuse of discretion.

The Hospital argues that it is entitled to attorney fees and costs because (1) Dr. Muzquiz's claim under 42 U.S.C. § 1983 was unsustainable from its inception because the Hospital is a private entity; (2) Dr. Muzquiz's breach of contract claim was barred by Michigan law; (3) his intentional infliction of emotional distress claim was factually and legally insufficient; (4) his antitrust claim was barred by Sixth Circuit precedent; and (5) at trial he produced no evidence of discrimination on the basis of age or national origin. As such, the hospital argues,

the entirety of Dr. Muzquiz's action in the district court was without foundation in fact or law.

In deciding this issue, we find authority addressing the award of attorney fees and costs to defendants under Title VII or 42 U.S.C. § 1988 to be instructive. In setting out the "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith" standard in *Christiansburg Garment Co.,* the Supreme Court provided the following caveat:

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset a party may have an entirely reasonable ground for bringing suit.

434 U.S. at 421–22, 98 S.Ct. at 700–01.

After careful review, we conclude that Dr. Muzquiz's claims were not without foundation so as to entitle the Hospital to an award of attorney fees and costs under HCQIA. Based on statements made to him, based on the protracted processing of his application for catheterization privileges in contrast to the processing of the applications of others who had applied at the same time, and based on the fact that he was the oldest applicant and the only applicant of Mexican heritage, Dr. Muzquiz had a legitimate factual basis

---

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved

or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). It is undisputed that the Hospital qualifies as having substantially prevailed below.

for alleging that the extreme delay in his application processing was the result of a bias, possibly competition-based and/or discrimination based on national origin or age. The fact that several of his claims either lacked sufficient evidence to go forward, or were determined to be precluded by legal precedent in this circuit or under Michigan law, does not mean that those claims were completely without foundation. *See Hughes,* 449 U.S. at 15–16, 101 S.Ct. at 178–79 ("[a]llegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, 'groundless' or 'without foundation' as required by *Christiansburg.*") Further, the fact that Dr. Muzquiz was unable to present sufficiently probative evidence of discrimination at trial does not render his discrimination claims groundless.

On cross-appeal, the Hospital argues that it is entitled to an award of attorney fees for this appeal because Dr. Muzquiz's claims on appeal are without foundation in fact or law. Again we disagree. We have explained that "to find an appeal unfounded, we must conclude that the appeal had no foundation in law upon which the appeal could be brought." *Wrenn v. Gould,* 808 F.2d 493, 505 (6th Cir. 1987). Although ultimately the law was not in Dr. Muzquiz's favor, his appeal had legal foundation. The district court made certain discretionary determinations to exclude evidence at trial, and Dr. Muzquiz sought to reverse those rulings through appropriate, although ultimately unsuccessful, legal arguments. Dr. Muzquiz sought to challenge the district court's interpretation of Michigan law with respect to his breach of contract claim. Overall, his arguments before this court, although ultimately unsuccessful, were not completely without legal foundation. We thus hold that the Hospital is not entitled to attorney fees for this appeal.

### III. Conclusion

For the reasons just stated, we affirm the decision of the district court and we deny the request for attorney fees and costs on appeal.