**Jose C. ALBA, M.D., Plaintiff,**

v.

**MARIETTA MEMORIAL HOSPITAL, et al., Defendants.**

No. 94CV00524.

United States District Court, S.D. Ohio, Eastern Division.

Sept. 10, 1998.

Deborah Ruth Lydon, Dinsmore & Shohl, Cincinnati, OH, for plaintiff.

Joseph J. Feltes, Buckingham, Doolittle & Burroughs, Canton, OH, William Charles Curley, Keener Doucher Curley & Patterson, George Michael Romanello, Zeiger & Carpenter, Columbus, OH, for defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on both of Defendants' Motions for Summary Judgment (docs. 90, 91). Plaintiff, Dr. Joseph C. Alba, M.D., alleges that Defendants, Dr. Gregory B. Krivchenia, Sr., M.D., and Marietta Memorial Hospital, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, in restricting Plaintiff's surgical privileges through the formal peer review process. In addition, Plaintiff has brought eight state law claims against Defendants which arise out of the same alleged wrongful conduct. Oral argument on the Motions was held on February 20, 1998. The Plaintiff was subsequently granted leave to file a surreply and to supplement the record for summary judgment purposes (doc. 146), the Defendants responded (doc. 147), and the Motions are again now ripe. This Court issued an earlier Interim Order on May 7, 1998, and now issues its Final Opinion and Order in this matter.

## II. BACKGROUND

### A. General Overview

Plaintiff, Dr. Jose C. Alba, M.D., ("Alba"), first began working at Defendant, Marietta Memorial Hospital ("MMH"), in Marietta, Ohio in 1972. He was granted full surgical privileges in 1973. He practiced exclusively at MMH as a general surgeon. Due to a surgical complication in 1976, however, Alba's surgical privileges were temporarily restricted for about one year. Again in 1983, Alba's surgical privileges were temporarily restricted. The temporary nature of this second restriction later became contingent upon Alba becoming Board certified in general surgery.

The Board of Trustees' decision to impose temporary restrictions on Alba's surgical privileges until he became Board certified was the ultimate result of the peer review process at MMH. This process involved several committees of doctors reviewing various complications that Alba had had in his surgical practice. Dr. Gregory B. Krivchenia, Sr., M.D. ("Krivchenia") a Board Certified orthopaedic surgeon and chairman of the medical staff Credential Committee at that time, became aware of these complications and was instrumental in this process. Alba had an initial hearing regarding the restriction of his privileges and an appellate review hearing. In addition, Alba was represented by counsel in preparation for and at the appellate review hearing in 1984.

Nine years later, in 1993, Alba was allegedly told by a doctor at MMH, who had reviewed the available documents from the 1984 peer review process, that there were discrepancies in the record, or that a fraud had been committed against him during the process. Alba suspected an anti-competitive purpose. Plaintiff again retained counsel and filed his Complaint on June 9, 1994. He alleges that the restriction of his surgical privileges at MMH was a part of a greater anticompetitive conspiracy to oust older, generalist physicians like him through the fraudulent subversion of the peer review process, so that younger specialists with greater revenue-generating abilities (such as board-certified orthopedists) could be substituted in their place. He also alleges that the marketplace was injured in that it was suffering from a low supply of orthopedic services, and that Dr. Krivchenia succeeded in monopolizing the market. Finally, Alba alleges that the restrictions imposed upon him by MMH in 1983–84 essentially ruined his practice.

### B. Statement of Facts

Dr. Alba first began work as a general surgeon at MMH in 1972. In May 1976, Dr. Alba's privileges at MMH were restricted and he was required to have consultation for all major surgical cases. These restrictions, however, were lifted after less than a year. In March 1983, an Ad Hoc Committee of general surgeons, appointed by the chief of surgery, recommended that Alba's privileges again be restricted. On March 28, 1983, the recommended restrictions were imposed by MMH's Executive Committee. The restrictions required that he be monitored by a qualified general surgeon for every major surgical procedure he performed. The restrictions were to be in place for approximately a year until reappointments to the

Hospital's 1984 staff membership were made. Plaintiff did not contest these restrictions.

The Medical Staff Executive Committee, the Credentials Committee, and the Ad Hoc Committee of general surgeons reviewed the restrictions on Dr. Alba's privileges again in September 1983, so that a recommendation could be made with regard to Alba's 1984 surgical staff privileges. On October 4, 1983, the Ad Hoc Committee recommended that the restrictions remain in place. However, the specific restrictions recommended by the Committee at that time amounted to what Plaintiff calls "some loosening" of the restrictions imposed in March 1983. On the same date, the Credentials Committee recommended that the restrictions remain, but again, in Plaintiff's terms, its recommendation resulted in "some loosening" of the restrictions imposed in March 1983.

On November 15, 1983, at a meeting of the Executive Committee, Dr. Krivchenia allegedly falsely reported that the Credentials Committee believed Dr. Alba "lacked surgical judgment" and good surgical technique, and that he should therefore lose his major surgical privileges altogether. In addition, the Executive Committee was allegedly never told about what Plaintiff calls the more favorable reports from the Ad Hoc Committee or the Credentials Committee.

On November 28, 1983, Alba was notified of the Executive Committee's recommendations, which were largely consistent with both the Ad Hoc and Credentials Committees' recommendations—a temporary restriction in major surgical privileges with certain exceptions. However, the Executive Committee added to its recommendation to the Board of Trustees that the restrictions not be lifted until Dr. Alba became Board certified in general surgery.

On December 7, 1983, Alba requested an appellate hearing and requested that members of the original Ad Hoc Committee be included on his Hearing Panel. His request was denied, however, and the Panel was made up of seven disinterested physicians, who were not in direct economic competition with Alba, and, therefore, were not general surgeons. Plaintiff did not object any further to the composition of the panel. The denial of Alba's request was based upon an outdated set of by-laws (1979). The by-laws actually in force at the time (adopted in September, 1982) required one member of the original Ad Hoc Committee and one member of the Executive Committee to serve on the appellate Hearing Panel. The 1979 by-laws, however, required that the Panel be composed of disinterested physicians. In all other respects, the procedures outlined in the 1979 version of the bylaws were equivalent to the by-laws adopted in September, 1982.

On January 3, 1984, Alba received a "bill of particulars" from MMH, which included information regarding eight surgical cases that would be in question at the Hearing Panel. On January 12, 1984, Alba's hearing before the Hearing Panel took place. Dr. Krivchenia allegedly informed the Hearing Panel that eight separate cases were reviewed by the Executive Committee, as well as the chief of surgery, and the Credentials Committee, in making their recommendations. Plaintiff alleges that this representation was false, and that only Dr. Krivchenia had reviewed the eight cases.

Dr. Krivchenia also allegedly told the Hearing Panel that the Executive Committee had fully considered the recommendations of the Ad Hoc Committee and the Credentials Committee before making its recommendation to the Board of Trustees. Plaintiff alleges that this also was a false statement, since the Executive Committee was never told about the "more favorable" reports from the Ad Hoc Committee or the Credentials Committee.

The Chairman of the Hearing Panel, Dr. Scileppi, initiated the Hearing Panel proceedings by stating that he would express no opinion about Alba's work and would remain neutral unless he was needed to break a tie. During the deliberations by the Hearing Panel, however, Scileppi allegedly did not remain neutral. Instead, he allegedly urged the other Panel members to agree with the restrictions and "exaggerated" about Dr. Alba's deficiencies during the deliberations. In addition, Dr. Scileppi discussed cases other than the eight mentioned during the hearing.

On January 13, 1984, the Hearing Panel issued its conclusions and recommendations to the Executive Committee which stated that they were in unanimous agreement with the recommendations of the Executive Committee temporarily to limit the privileges of Dr. Alba. Plaintiff alleges that the Hearing Panel was not in unanimous agreement. The transcript of the recordings of the deliberations allegedly reveals that several Hearing Panel members thought that the restrictions recommended by the Executive Committee were too harsh. Plaintiff alleges that a final vote may not ever have been taken since no written record exists. On January 31, 1984, the Executive Committee informed Dr. Alba that the restrictions affirmed in November 1983 would remain in place until he became Board certified.

On February 16, 1984, Alba requested an appellate review before the Board of Trustees of MMH. Between February and June 1984, Alba hired counsel to assist him in the appellate review process. In preparation, Alba and his counsel obtained a copy of the transcript of the Hearing Panel proceedings, (but not the deliberations), a copy of the By-laws dated 1979, (but not the applicable By-laws dated 1982) and, finally, a copy of the Ad Hoc Committee's October 4, 1983 recommendation. However, Plaintiff alleges that he was denied access to any minutes of the meetings at which his restrictions were discussed. The hearing before the Board of Trustees was continued at least once at Plaintiff's request so that he and his counsel could fully prepare.

On July 12, 1984, the appellate review hearing before the Appellate Review Committee of the Board of Trustees was held. Plaintiff and his counsel each had an opportunity to be heard and to protest the recommendation of the Executive Committee and to raise any issues of impropriety or unfairness that they believed occurred. Indeed, it is clear from his statement, that Alba's counsel suspected wrongdoing in the imposition of these restrictions:

> ... Subsequent to this hearing [before the Hearing Committee], which you have a transcript of,[1] Dr. Alba came to our firm ... [W]e told Dr. Alba we would take a look at it [the proceedings], because he had some serious reservations about what he contended had been done to him by, I guess, your [Medical] Executive Committee or your Credentials Committee ...

> ... What we did is we began to look for other reasons [why Dr. Alba's major surgical privileges were being restricted] ...[2] I am certainly not here to accuse anybody of **ulterior motives** in trying to get Dr. Alba's [major] surgical privileges suspended at this hospital. What I have found, however, is the following: that when he [Alba] began practice here in January of 1973, you had lots of patients and a full hospital. Business was booming. In January of '73 until January of 1983, or maybe a little bit before, business was fine and there was (sic) no problems. What we have found, at least in our brief investigation of this hospital, is that elective surgery dropped drastically ... **You have a group of doctors, and again, correct me if I am wrong, but that Board [Medical Executive Committee] consists of all doctors whose livelihood depends on this hospital, a group of doctors get together and decide someone is unfit to be a surgeon—after ten years—and I would** just say to you gentlemen tonight if he is unfit to be a surgeon in 1983, what was he in '82, in '81, and every other year when you let him do surgery.[3] Why, all of a sudden in 1983, when you don't have enough patients to fill your beds, you decide all of a sudden he is unfit to be a surgeon? 77 patients, I think were registered in the hospital, I don't know whether that was a month ago or whatever. 90% of his practice is elective surgery. He

---

1. This statement alone indicates the information that was in the possession of Plaintiff's former counsel and reviewed by said counsel in preparation for the hearing before the Appellate Review Committee.

2. Mr. Leez, before getting to this point, articulates certain reasons, such as lack of competence and concern about malpractice cases, that had been mentioned by various committees.

3. Plaintiff's privileges were restricted for the first time in 1976.

doesn't do that elective surgery, **someone else divvies up the pot . . .** [4]

Dr. Krivchenia presented the case against Plaintiff, and allegedly made two misrepresentations regarding: (1) the years of practice that had been selected for review by the Committees; and (2) the number of cases that had been presented to and reviewed by the Executive Committee. The Appellate Review Committee of the Board of Trustees ultimately recommended to the Board that it impose those restrictions on Plaintiff's surgical privileges that had been recommended by the other Committees. On July 18, 1984, the Board of Trustees adopted the recommendations of the Appellate Review Committee, affirming the recommended restrictions upon Alba.

After July 1984, Plaintiff felt that he had been treated unfairly and that he had been wronged by the imposed restrictions. He recommended to his counsel that they file a lawsuit to regain his privileges. His counsel declined, and the attorney-client relationship was severed in September 1984. In late 1984, Plaintiff applied for privileges at St. Joseph's Hospital in West Virginia, but was denied. Plaintiff then applied for and was granted primary care privileges at Selby Hospital in Marietta. Only much later, in 1986 and 1989 respectively, did he apply for and was he granted minor and then major surgical privileges at Selby.[5]

In 1985, Plaintiff asked MMH's new President to look into his restrictions and to assist him in regaining them, but he allegedly received no response. From 1989 to 1992, Plaintiff did very little to rebuild his surgical practice at Selby Hospital. In 1992, Plaintiff dropped the coverage to perform major operations from his malpractice insurance.

In March 1993, however, Alba applied for reappointment of his surgical privileges at MMH. Alba had not taken any efforts to date to become Board certified. In August 1993, MMH's Executive Committee appointed a three doctor panel, including one Dr.

White to review the 1983/84 file on the restriction of the surgical privileges of Dr. Alba. The three doctors allegedly found a number of "discrepancies" in the peer review process afforded Alba. Specifically, and among other things, it was discovered that the October 4, 1983 Ad Hoc Committee Recommendation was allegedly never reported to the Executive Committee.

In October 1993, Dr. White allegedly told Dr. Alba of these discrepancies and that they occurred primarily due to the actions of Dr. Krivchenia. Dr. Alba's 1993 request to have his surgical privileges reinstated at MMH, however, was never acted upon by Dr. White, or the three doctor panel on which Dr. White sits. In January, 1994 Alba submitted to MMH his surgical logs from Selby and letters of recommendation, but he heard nothing from MMH. In June 1994, Plaintiff filed this lawsuit. And in 1995, Plaintiff retired without ever becoming Board certified.

### III. ANALYSIS

#### A. Standard on Summary Judgment

Summary judgment is appropriately entered for the moving party as a matter of law when all the papers before a trial court show that there are no genuine issues of material fact in light of the substantive law governing the case. Fed.R.Civ.P. 56(c). The litigant seeking summary disposition of a case bears the initial burden of demonstrating, through affidavits or otherwise, the absence of genuine factual issues. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the non-moving party then has the obligation to produce probative evidence supporting its view that a dispute exists.

On summary judgment, a plaintiffs' evidence is to be believed and all reasonable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**4.** Transcript of Appellate Hearing before the Board of Trustees, July 12, 1984, pp. 2, 4, Exhibit D. (Emphasis added).

**5.** Even though Alba regained major surgical privileges at Selby in 1989, he alleges that by that time, and as a result of Defendants' action, he had very few referral services and his practice suffered.

(1986). The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to the material facts ..., the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). In the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct. *Id.* at 587–88, 106 S.Ct. 1348. This Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Street v. Bradford,* 886 F.2d 1472, 1479 (6th Cir. 1989).

### B. Plaintiff's antitrust claim is barred by the "intracorporate immunity" doctrine

Defendants' Motions for Summary Judgment with respect to the antitrust claim are premised upon three separate and independent bases:[6] (1) Plaintiff's claim is barred by the applicable statute of limitations, and he fails to raise an issue of fact on the issue of fraudulent concealment; (2) Plaintiff's claim is barred by the "intracorporate immunity" doctrine; and (3) Plaintiff's claim is barred by the doctrine of "antitrust injury." Each of these bases is an independent basis for summary judgment on Plaintiff's antitrust claim. For the following reasons, this Court grants Defendants' Motions for Summary Judgment on Plaintiff's claim for a violation of Section 1 of the Sherman Act.[7]

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1 (1988). According to the statute, a plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities. *See Schwartz v. Aultman Health Services Assn.,* unpublished, No. 94–3967 (6th Cir.1995) 1995 WL 696715 (citing *Capital Imaging v. Mohawk Valley Medical Associates,* 996 F.2d 537, 542 (2nd Cir.1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993)). Unilateral conduct on the part of a single person or enterprise, even if such conduct unreasonably restrains trade, falls outside the purview of this provision in the antitrust law. *See. Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). For that reason, an agreement between a parent corporation and its wholly-owned subsidiary or its agents is not a concerted action for purposes of the Act. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

This requirement has come to be known as the "intracorporate immunity" doctrine, also commonly referred to as the "intracorporate conspiracy" doctrine, because unilateral actions of a single enterprise are immune from liability under § 1 of the Act. The traditional rule under this doctrine is that "'[t]wo or more individual officers, directors or agents within a corporation, acting on behalf of that corporation, are considered incapable of conspiring with each other or with their corporation, for Section 1 purposes.'" *Smith v. Northern Mich. Hospitals, Inc.,* 703 F.2d 942, 950 (6th Cir.1983)

---

**6.** The parties agree that the protections afforded by the Health Care Quality Improvement Act of 1986, codified at 42 U.S.C. § 11011, *et seq.*, do not apply to the actions taken against Alba in 1983–84.

**7.** Because this Court finds in favor of Defendants on their Motions for Summary Judgment on Plaintiffs' only federal claim—the antitrust claim—it need not address the parties' arguments related to Plaintiff's eight state law claims. Pursuant to the favored practice in this Circuit,

this Court will decline to exercise its pendent jurisdiction over those state law claims. See *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."); *see also Gaff v. FDIC,* 814 F.2d 311, 319 (6th Cir.1987) (recognizing a general rule disfavoring a district court's exercise of pendent jurisdiction when federal issues are dismissed before trial).

(quoting *Harvey v. Fearless Farris Whole-sale, Inc.*, 589 F.2d 451, 455 n. 7 (9th Cir. 1979)). *See, Copperweld,* 467 U.S. 752, 104 S.Ct. 2731.

■ In *Smith v. Northern Mich. Hospitals, Inc.*, 703 F.2d 942, 950 (6th Cir.1983), the Sixth Circuit applied this rule in the context of hospitals and physicians for the first time. Physician staff members at a hospital which merged two hospitals into one sued the hospital and a medical clinic corporation for antitrust conspiracy. Part of the plaintiffs' claim was premised on the theory that some doctors in the medical clinic corporation conspired on behalf of the corporation with other doctors in the corporation to exclude the plaintiffs. The district court dismissed the claim.

The Sixth Circuit affirmed the dismissal under the traditional rule stated above. In addition, the Court rejected the application of the "independent personal stakes" exception to the rule because "to apply this supposed exception for 'independent stake to the present case would be paramount to allowing the exception to subsume the rule.'" *Id.* at 951. The Court also stated that "[T]here are rather substantial policy reasons for not adopting such an exception." *Id.* at 950 n. 15. While the Court recognized that other Circuits had adopted and applied this exception, it stated that "it is doubtful that we would follow the analysis in" those cases. *Id.* at 951 n. 17.

The Sixth Circuit again addressed this doctrine in *Potters Medical Center v. City Hospital Ass'n,* 800 F.2d 568 (6th Cir.1986). Plaintiffs, a medical center and 2 clinics, sued a hospital, its attorney/Board member, and a senior member of its medical staff for antitrust conspiracy, alleging that the two individuals/agents conspired with the defendant hospital to, among other things, refuse to grant staff privileges to doctors at Plaintiffs' medical center and the clinics. The district court dismissed the claims.

The Sixth Circuit agreed that "as a matter of law" the two agents of the hospital "lack the capacity to conspire with" the hospital. *Id.* at 573. The rationale is that agents of a single firm share a unity of economic purpose with the firm, so that agreements among them do not impermissibly coalesce economic power that was previously directed toward divergent goals. Plaintiff/appellants argued for the "independent personal stakes" exception, but the Court did not recognize the exception:

Although several courts have recognized the 'independent personal stakes' exception to the rule that officers and agents lack capacity to conspire with their corporation, ... this circuit has never endorsed the exception. In fact, this court has noted the 'rather substantial policy reasons for not adopting such an exception.' Even if we were to recognize the exception, appellants argument would still fail.

*Id.* at 573. The Court thus affirmed.

The Court again addressed the rule and the exception in *Nurse Midwifery Associates v. Hibbett,* 918 F.2d 605 (6th Cir.1990), where two nurse midwives and an obstetrician sued three hospitals, and certain members of the medical staff of two of those hospitals, among others, under the Sherman Act. The plaintiffs alleged that the medical staff had conspired with the hospitals to bar them from obtaining hospital privileges. The district court granted summary judgment, relying on *Potters* and *Smith,* and declined to adopt the exception to the doctrine.

On appeal, the Sixth Circuit discussed the "intracorporate conspiracy doctrine" in general at length. It discussed how some courts have held that the doctrine does *not* prevent a finding of a conspiracy between a hospital and its medical staff or among the members of the medical staff, because the relationships are different than corporation/agent relationships or agent/agent ones. *See Bolt v. Halifax Hosp. Med. Center,* 851 F.2d 1273, 1280 (11th Cir.), vacated, 861 F.2d 1233 (11th Cir. 1988) (*en banc* ), reinstated in part, 874 F.2d 755 (11th Cir.1989) (*en banc* ); *Weiss v. York Hosp.,* 745 F.2d 786, 813–17 (3d Cir.1984).

However, the *Weiss* court's holding also provided that the doctrine did prevent a finding of conspiracy in the context of peer review proceedings regarding staff hospital privileges. *Id.* at 816–17. The *Weiss* court held that the members of the medical staff were capable of conspiring amongst them-

selves because they were not really officers of the hospital when practicing medicine in their individual capacities in competition with each other. *Id.* at 814–17. Unlike *Bolt,* however, the *Weiss* court held that the members of the medical staff were acting only as officers of the hospital when they made staff privilege decisions for the hospital, and could not conspire with the hospital because the medical staff was not in competition with the hospital. *Id.* at 816–17.

The Sixth Circuit in *Nurse Midwifery* agreed with the *Weiss* court's solomonic decision, and held that the doctrine "prevents a finding of conspiracy between a hospital and its medical staff but, in certain situations, does not preclude a conspiracy among individual members of the medical staff." *Id.* at 614. The Court reasoned:

> there are no strong antitrust concerns that would warrant a departure from traditional concepts of agency since the hospital and the medical staff are not competitors. The fact that the medical staff may have acted with anticompetitive motives is not sufficient to warrant a finding that a hospital's decision to accept the staff recommendation is an antitrust conspiracy.

*Id.* Thus, the Court affirmed the grant of summary judgment.

While the Sixth Circuit in *Nurse Midwifery* noted that some courts had recognized the "independent personal stakes" exception, it described that "this court, while not specifically rejecting the . . . exception," had noted the substantial policy reasons for not adopting the exception. *Id.* at 613. The Court then rejected the plaintiff's arguments in that case for adopting the exception:

> We are not inclined at this point to follow several other circuits in adopting this exception, in view of substantial policy reasons for not doing so . . . We are not convinced that an agent acting with anticompetitive motives due to some independent personal stakes raises sufficient antitrust concerns to warrant abandoning the traditional rule that a principal cannot conspire with one of its agents. See also P. Areeda, Antitrust Law ¶ 1471 (1986).

*Id.* at 615.

The Sixth Circuit again affirmed this holding in this context in *Muzquiz, Jr. v. W.A. Foote Memorial Hospital,* 70 F.3d 422 (6th Cir.1995). The plaintiff's doctor in *Muzquiz* sued his hospital for among other things, an antitrust violation when it, through its Board, denied his request for privileges. The Sixth Circuit affirmed the dismissal of the antitrust claim on the basis that "this court's holding in *Nurse Midwifery* precludes an antitrust claim against the hospital in this case." *Id.* at 429–30.

Plaintiff spent a great deal of effort in his briefs and at oral argument presenting arguments why the intracorporate immunity doctrine does not bar his claim in this case. In addition, Plaintiff, spent similar efforts in explaining why, if the doctrine does apply, the independent personal stakes exception should be adopted by this Court and applied to his antitrust claim. This Court is not persuaded, however, that the Sixth Circuit's ruling that a hospital cannot conspire with its medical staff in peer review proceedings can be varied from in this matter. As the Sixth Circuit has stated, "no strong antitrust concerns" in the hospital staff privileges context warrant a departure from the traditional rule, and the independent personal stakes theory fails to raise "sufficient antitrust concerns" to warrant its adoption in this Circuit. *Nurse Midwifery* at 614–15.

Therefore, as in *Muzquiz,* plaintiff's antitrust claim against the hospital and its staff (Dr. Krivchenia) in this context—hospital staff privilege decisions made through the peer review process—is precluded, as a matter of law, by the Sixth Circuit's holding in *Nurse Midwifery.* Furthermore, this Court is bound by the Sixth Circuit's determination in these cases not to adopt the independent personal stakes exception to this doctrine in the case *sub judice.* Thus, Plaintiffs' claim under Section 1 of the Sherman Act must be dismissed.

Since this finding is a sufficient basis to support summary judgment on the antitrust claim, this Court need not address Defendants' two other separate and independent bases for summary judgment. However, because this Court also finds for Defendants on

their statute of limitations argument, that basis will be addressed.

### C. Plaintiff fails to raise a genuine dispute of material fact with regard to fraudulent concealment, and therefore, his antitrust claim is time-barred.

Defendants also argue that Plaintiff's antitrust claim is time-barred because the statute of limitations on a private antitrust action is four years. *See* 15 U.S.C. § 15. The restriction of Plaintiff's major surgical privileges at MMH was finalized on July 18, 1984. He did not file suit until June 1994, almost ten years later. Plaintiff argues that the statute was tolled until 1993 due to the acts of fraudulent concealment perpetrated by Defendants. Defendants, however, argue that Plaintiff had sufficient information to alert him to the "possibility of wrongdoing" in 1984, and that he failed to exercise due diligence to discover any alleged wrongdoing after that date.

■ In this Circuit, Plaintiff must prove three elements to justify his claim that fraudulent concealment tolls the statute:

(1) Defendant concealed the conduct that constituted the cause of action;

(2) Plaintiff failed to discover the operative facts that are the basis of his cause of action within the limitations period;

and (3) Plaintiff used due diligence until discovery.

*Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975). Plaintiff's failure to raise an issue of fact as to any one of these three elements is fatal to his claim.

The focus is properly weighted on the second two factors of the *Dayco* Test as explained by Judge Speigel in *Ohio v. Louis Trauth Dairy, Inc.,* 856 F.Supp. 1229, 1238 (S.D.Ohio 1994):

"the bedrock threshold for granting the equitable tolling of the statute of limitations for fraudulent concealment must be whether a Plaintiff knew or through due diligence should have known the existence of his claim."·

Whether or not Plaintiff adduced sufficient evidence to raise a genuine dispute of material fact related to the first two factors necessary for a fraudulent concealment analysis need not be addressed because Plaintiff's evidence is insufficient to survive summary judgment on the third factor—whether he exercised due diligence from the date of the alleged wrongdoing until the date of its alleged discovery.

■ Plaintiff first argues that his duty of due diligence did not arise until 1993, when he received notice of the alleged wrongdoing. However, due diligence must be exercised once suspicions of wrongdoing do or reasonably should arise. *Dayco,* 523 F.2d at 394 ("any fact that should excite suspicion is the same as actual knowledge of his entire claim.") It is undisputed that Plaintiff suspected wrongdoing in the restriction of his surgical privileges by the date of the hearing before the Appellate Review Committee of the Board of Trustees, July 12, 1984. His counsel's statement to that Committee on that day reveals that he and Plaintiff suspected an economic motive to the restriction. In addition, Plaintiff admits that he thereafter requested that his counsel file suit because he felt as though he had been wronged and treated unfairly. The fact that his attorney declined to file suit did not prevent Plaintiff from seeking to retain other counsel to handle his complaints. Therefore, Plaintiff's duty to exercise due diligence in discovering the alleged wrongdoing arose after July 12, 1984, when it is undisputed that he and his counsel suspected wrongdoing.

Plaintiff next argues that any attempt to uncover the suspected wrongdoing after July 1984 would have been futile since the information necessary to discover what he believed to be the truth was in the complete control of Defendants. Furthermore, Plaintiff argues that had he filed suit in 1984, he would not have been likely to uncover this antitrust conspiracy because he would not have been granted access to these secret peer review documents. Plaintiff relies on the fact that no court in this Circuit had addressed the issue of the discoverability of peer review documents until 1991 in the case of *LeMasters v. The Christ Hospital,* 791

F.Supp. 188 (S.D.Ohio 1991) (peer review information sought by physician not privileged).

However, even though the *LeMasters* case was a case of first impression in this Circuit, the *LeMasters* court cited to and relied upon other circuit and district court cases, which predated 1984, and which affirmed the discoverability of peer review documents. The District Court for the Eastern District of Michigan granted a plaintiff's motion to compel production of peer review report, in spite of a Michigan statute purporting to establish "absolute" privilege, in *Dorsten v. Lapeer County General Hospital,* 88 F.R.D. 583 (E.D.Mich.1980). *See, also Memorial Hospital vs. McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir.1981) (also cited in *LeMasters* and holding that privilege against discovery did not extend to hospital in federal antitrust action given the public interest in the private enforcement of federal antitrust laws). Thus, had Plaintiff and his counsel sued in 1984 for the alleged wrongdoing in restricting his surgical privileges, it is reasonable to assume that he would have uncovered the evidence which he has today uncovered as a result of suing in 1994. *See Dayco,* 523 F.2d at 394 ("the means of knowledge are the same thing as knowledge itself.") (citing *Wood v. Carpenter,* 101 U.S. 135, 143, 25 L.Ed. 807 (1879)).

Plaintiff's only excuse for sitting idly by from 1985 to 1993 is that he was unaware of the existence of a conspiracy or any fraudulent conduct. However, he believed that he was wronged and treated unfairly, and his lawyer suspected at least an anticompetitive if not antitrust purpose, all in 1984. Due diligence requires more than sitting idly by until the facts are someday revealed to you. *See Campbell v. Upjohn Co.,* 676 F.2d 1122, 1128 (6th Cir.1982). Whatever it requires, it is clear that due diligence requires something more than what Plaintiff did in this case. Therefore, Plaintiff's claim for an antitrust violation under Section 1 of the Sherman Act is time-barred.

## IV. CONCLUSION

Defendants' Motions for Summary Judgment are hereby **GRANTED** as to the antitrust claim. This Court declines to exercise its pendent jurisdiction over the remaining state law claims, dismisses those claims, and, therefore, **DISMISSES** this matter in its entirety.

**IT IS SO ORDERED.**